**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **WILLIAM S. MCLAURINE, II,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **vs.** | * | **CIVIL ACTION NO.: 3:06-cv-1014-MEF** |
| | * | |
| **the CITY OF AUBURN, ALABAMA, et al.,** | * | |
| | * | |
| **Defendants.** | * | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants in the above-styled cause, and pursuant to *Federal Rule of Civil Procedure* 56, move this Court to grant summary judgment in favor of Defendants in that there is no genuine issue of material fact to be submitted to a jury and judgment should be entered in its favor as a matter of law as to all Plaintiff's claims. In support of this motion, the Defendants rely upon the following:

1.    All pleadings filed in this matter.

2.    Exhibits A through E, attached hereto[1]

        Exhibit A - Trial Transcript

        Exhibit B - Deposition of William S. McLaurine, II

        Exhibit C- Affidavit of Frank deGraffenried, IV

        Exhibit D-Affidavit of Benjie Walker

        Exhibit E - Court of Criminal Appeals Opinion

3.    Memorandum Brief, submitted contemporaneously herewith.

---

[1] Although specific page/line or paragraph cites are made to all factual statements made in the memorandum brief, Defendants rely on the depositions and affidavits referenced in their entirety and reserve the right to further cite to the depositions or affidavits relied upon, if necessary, when replying to any response Plaintiff might file to this motion.

WHEREFORE PREMISES CONSIDERED, the Defendants request summary judgment be granted in their favor and all Plaintiff's claims dismissed as a matter of law.

RESPECTFULLY SUBMITTED this the 30th day of April 2007.


                                                    /S/ Randall Morgan
                                                    Randall Morgan [8350-R70R]
                                                    Elizabeth Brannen Carter [3272-C-38-E]
                                                    HILL, HILL, CARTER, FRANCO,
                                                        COLE & BLACK, P.C.
                                                    425 South Perry Street
                                                    Montgomery, Alabama 36101-0116
                                                    (334) 834-7600
                                                    (334) 263-5969 facsimile
                                                    Rmorgan@hillhillcarter.com
                                                    Counsel for Defendant

OF COUNSEL:

HILL, HILL, CARTER, FRANCO
    COLE & BLACK, P.C.
Post Office Box 116
Montgomery, Alabama  36101-0116
(334) 834-7600
(334) 263-5969


### CERTIFICATE OF SERVICE

I Hereby Certify that I have this date served a true and correct copy of the foregoing *Memorandum Brief in Support of Motion for Summary Judgment on Behalf of Defendants* with the Clerk of the Court for the United States District Court, for the Middle District of Alabama, using the CM/ECF system and to William S. McLaurine, II, 222 Tichenor Avenue #4, Auburn, Alabama 36830, by United States mail, postage prepaid and properly addressed on this the 30th day of April 2007.


                                                    /S/ Randall Morgan
                                                    Of Counsel

# EXHIBIT "A"

# TRIAL TRANSCRIPT

1          witness.

2          MR. WHITE:  City calls Officer Bean.

3          THE COURT:  Come right over here and

4          raise your right hand.

5          LAVARO BEAN

6     The witness, having first been duly

7  sworn to speak the truth, the whole truth and

8  nothing but the truth, testified as follows:

9          THE COURT:  Come around here and have a

10          seat and speak directly into that

11          microphone.

12          DIRECT EXAMINATION

13  BY MR. WHITE:

14  Q.   Officer, state your name for the Record,

15       please, sir.

16  A.   Lavaro Bean.

17  Q.   And how are you employed?

18  A.   Patrolman with the City of Auburn.

19  Q.   And how long have you been employed in that

20       capacity?

21  A.   16 years.

22  Q.   And is that also the same period of time that

23       you have been in law enforcement in general?

24  A.   Yes, sir.

25  Q.   Are you familiar with the area that this

1    named there, I don't know if the jury can

2    read that.  This is Toomer Street here; is

3    that correct?

4  A.  Yes, sir.

5  Q.  And then this is Genelda?

6  A.  Yes, sir.

7  Q.  Okay.  Thank you.  All right.  Now, let me

8    direct your attention back to the early

9    morning hours of November 27, 2004.  Were you

10    dispatched to that area?

11  A.  Yes, sir, I was.

12  Q.  Okay.  Can you give the jury the nature of

13    the dispatch call that you received?

14        MR. MCLAURINE:  Objection, hearsay.  He

15            was not privy -- Officer Bean was

16            not privy to the conversation.

17        THE COURT:  Well, he's asking the

18            nature of the call.  Overruled.

19  Q.  You received a dispatch call for you to

20    respond to a certain area; is that correct?

21  A.  Yes, of a suspicious or mysterious person

22    walking in the area of North College Street

23    and Glenn Avenue.  And he should be walking

24    westbound toward Donohue.

25  Q.  Westbound toward Donohue would be which

1        direction?

2   A.   Would be -- if you keep going, Glenn Avenue

3        would be about three blocks that way.

4   Q.   And did you respond to that location?

5   A.   Yes, sir, I did.

6   Q.   Okay. What, if anything, did you observe

7        upon responding at that location?

8   A.   When I received the call, I was at the

9        intersection of Glenn and Gay, and I

10       responded immediately over to College and Gay

11       Street -- I mean College and Glenn, and I

12       didn't see anybody fitting that description.

13   Q.   Okay. Then what did you do?

14   A.   I proceeded through the light. I continued

15       down Glenn Avenue, passing Wright Street, and

16       finally came to this point as I was about to

17       pass Toomer Street. I looked in that

18       direction and saw a -- the only person

19       walking period, which was McLaurine.

20   Q.   Okay. And when you received the dispatch,

21       were you given a clothing description?

22   A.   I was.

23   Q.   Do you remember what that clothing

24       description was?

25   A.   I believe it was dark pants and maybe a gray

Case 3:06-cv-01014-MEF-SRW    Document 63-2    Filed 04/30/2007    Page 5 of 39
JAN-05-2007 FRI 04:38 PM Adams,Umbach,Etc.              FAX NO. 3347492800                P. 02

97

1       shirt.

2   Q.  Gray?

3   A.  Or jacket.

4   Q.  Okay.  Did Mr. McLaurine's appearance

5      generally match the clothing description that

6      you were given?

7   A.  Yes, sir, it did.

8   Q.  And what, if anything, did you do when you

9      observed Mr. McLaurine?

10  A.  As I backed up, I noticed he was about 40 to

11     50 yards down Toomer Street.  I proceeded

12     down Toomer Street, noticed that he had on

13     white cap, and I radioed dispatch and let

14     them know that he was also wearing a white

15     cap and that I was about to be out.

16  Q.  Okay.  What, if anything, did you notice

17     about him before you got out on him?  Did you

18     notice anything about his gait or the way he

19     was behaving or the anything of that nature?

20  A.  Yes.  As I watched him walk, he was walking

21     on I believe it's going to be the east side

22     of the sidewalk on this side of the street.

23     He was walking very slowly, had his hands in

24     his jacket, and he was looking in the area of

25     the houses on this area.

1    Q.    Okay.  Tell me about November 27,

2          Thanksgiving holidays.  As a police officer

3          in the city of Auburn, what's important about

4          that period of time?

5    A.    That's definitely one of the two times

6          a year when our burglaries happens,

7          especially the apartments along those areas.

8          We often put officers on the ground,

9          especially that late at night, to walk those

10         areas to make sure that we don't have many

11         burglaries.

12   Q.    So Thanksgiving holidays is one of those

13         periods of times?

14   A.    Yes, sir.

15   Q.    And then Christmas holidays would be the

16         other one?

17   A.    Yes, sir.  And then spring break.

18   Q.    Spring break, okay.  And so when you get a

19         call of a suspicious individual in that area,

20         that rings a bell with you, so to speak,

21         doesn't it?

22   A.    Yes, sir, it does.

23   Q.    Okay.  And so you responded to

24         Mr. McLaurine.  What did you do immediately

25         upon arriving upon?

1    MR. MCLAURINE: Objection. Officer

2         Bean has not established a

3         reasonable suspicion to approach.

4    THE COURT: Overruled.

5    A.   I got out of my car. I called to him. I

6         said, hey, stop. He didn't stop. He

7         continued to walk and basically ignored me.

8    Q.   Uh-huh.

9    A.   One of the things I like to do is when I'm

10        approaching a suspicious person is to take

11        kind of a cover. Because he didn't stop, I

12        had to come out of the door in my car and

13        pursue after him.

14   Q.   What happened after that?

15   A.   I called to him a second time to say, hey,

16        stop, a little louder. And he did at that

17        point.

18   Q.   Okay. After he stopped, what, if anything,

19        did you say to him?

20   A.   I -- first thing I asked him, I asked him who

21        he was and why was he here.

22   Q.   Okay. Let me ask you this, first of all.

23        Were you in a marked patrol car?

24   A.   Yes, sir.

25   Q.   And were you wearing your uniform?

1  A.  Yes, sir, I was.

2  Q.  And you asked him who he was and what he was

3      doing there?

4  A.  Yes, sir.

5  Q.  And did he respond to you?

6  A.  He told me, Officer, I don't have to answer

7      those questions.

8  Q.  That was his first response to you?

9  A.  Yes, sir.

10 Q.  Okay. Did he give you a reason why he said

11     he didn't have to respond to those questions

12     at that point?

13 A.  No, he did not.

14 Q.  So tell me what happened at that point. What

15     did you say to him? What did he say to you?

16 A.  At that point, I basically said Mr.  -- I

17     said, sir, do you have any weapons on you?  I

18     said, all I need to see is some ID and you

19     can be on your way.  I said, but I have to

20     see some ID or you need to tell me your name

21     or something.  And he refused.

22 Q.  And do you have an estimation of how many

23     times you asked Mr. McLaurine that evening to

24     state his name or tell you where he was going

25     or give you his address?

1    A.    Until he was arrested, it probably was 24,

2          couple dozen times.

3    Q.    And how long -- I know some other officers

4          arrived later, but how long were you there

5          with Mr. McLaurine from the time that you

6          first approached him and questioned him until

7          he was ultimately placed under arrest?

8    A.    I think it was inside of 30 minutes.

9    Q.    All right.  Tell me what, if anything, you

10         did -- I realize at some point you called

11         Sgt. Matthews.  And tell the jury what

12         Sgt. Matthews is in relation to you.

13   A.    He was the sergeant at the time, shift

14         supervisor.

15   Q.    Okay.  And at some point in time, you called

16         Sgt. Matthews; is that correct?

17   A.    Yes, sir.

18   Q.    And why did you do that?

19   A.    Well, I explained to Mr. McLaurine that I

20         was -- that he was giving me no other options

21         but to possibly place him under arrest.  I

22         didn't want to make an arrest on him if I

23         could possibly get out of it, so I called my

24         shift supervisor.  Maybe he knew some other

25         way to talk with him, see if he could get him

1      to talk with us.

2   Q.  Okay.  And then Sgt. Matthews arrived at the

3      scene?

4   A.  He did.

5   Q.  And were you present when Sgt. Matthews

6      talked to the defendant?

7   A.  Yes, I was.

8   Q.  Okay.  Do you remember what Sgt. Matthews

9      said to the defendant?

10   A.  Not everything.

11   Q.  Just to the best of your recollection, what

12      did Sgt. Matthews say?

13   A.  He basically went over the same things that I

14      told him, that he has to -- we told him, the

15      law says you must give us your name and

16      address.  And we asked him -- he asked him

17      repeatedly.  He said, are you refusing to do

18      this?  The response was, yes, I'm not going

19      to give you anything.

20   Q.  And, at some point, was a question asked of

21      him, do you recognize us as being law

22      enforcement officers of the City of Auburn?

23   A.  Yes, sir.

24   Q.  Okay.  Who asked that?

25   A.  I asked that first, before Matthews got

1  there.  His response was, I understand your

2  interpretation of the law, but I'm not going

3  to answer your questions.  And he repeated

4  that when Sgt. Matthews asked him.

5  Q.  Did he tell you that he disagreed with your

6  interpretation of the law?

7  A.  That's true.

8  Q.  Okay.  All right.  So Sgt. Matthews gets

9  there, goes through the same thing that you

10  just told us; is that correct?

11  A.  Yes.

12  Q.  What, if anything, happened after

13  Sgt. Matthews arrived?  After Sgt. Matthews

14  had gone through that line of questioning

15  with the defendant, what happened at that

16  point?

17  A.  He told us to watch McLaurine.  He got on the

18  telephone and he called the shift commander,

19  which is Lt. Howell.

20  Q.  Lt. Howell was the shift commander; is that

21  correct?

22  A.  That is correct.

23  Q.  And he would have been the highest person on

24  duty that night with the Auburn Police

25  Department; is that correct?

1    A.    That is correct.

2    Q.    Now, let me back up just a minute.  Before he

3          called Lt. Howell, he asked you to do

4          something.  What was that?

5    A.    He told me to make sure that my -- turn the

6          camera on and also to provide Mr. McLaurine

7          with his rights.

8    Q.    Now, we are going to see a video here in just

9          a minute, but the video picks up at the point

10         in time where you have already spoken to the

11         defendant and Sgt. Matthews has already

12         spoken to the defendant; is that right?

13   A.    Yes, sir.

14   Q.    Okay.  And while I'm on the issue of the

15         video, part of the video doesn't have sound.

16         Do you know why that is?

17   A.    Yes, sir.

18   Q.    Why is that?

19   A.    The -- We have a microphone that connects to

20         the unit transmitter, and it was -- for some

21         odd reason, it didn't work that night and had

22         a short in it, found out later.

23   Q.    So we have visual but we don't have audio --

24   A.    Correct.

25   Q.    -- correct?

1    A.   Yes, sir.

2    Q.   All right.  So going back to where we left

3         off, Sgt. Matthews gets on the phone to

4         Lt. Howell.

5    A.   Right.

6    Q.   And Lt. Howell, does he arrive at the scene?

7    A.   Yes, sir, he does.

8    Q.   And were you present when Lt. Howell spoke

9         with the defendant?

10   A.   I was.

11   Q.   And do you recall, best of your recollection,

12        what Lt. Howell said to the defendant?

13   A.   Just repeated the same thing; basically, we

14        need your name and number and you're free to

15        to go.  All we need to know is your name so

16        we can run a computer check, make sure you're

17        not wanted anywhere.  And if you're not

18        wanted, you're free to go.  But he refused.

19   Q.   Okay.  Would you say that you gave him many

20        opportunities to give you his name, address,

21        and basic information, and he refused those

22        many opportunities?

23   A.   Yes, sir.

24   Q.   Now, at some point during your

25        conversation -- I believe it was when

1    Sgt. Matthews goes back to call Lt. Howell --
2    you tried to joke around with him a little
3    bit to loosen him up; isn't that right?
4  A.  Yes, sir, I did.
5  Q.  Okay.  What did you say to him when you were
6    trying to joke around with him?
7  A.  I kept begging him.  I kept telling him, just
8    give us your name.  And I would throw in
9    there -- I said, you're not talking to me
10   just because I'm black, are you?  And kind of
11   got a little smirk out of him.  But he still
12   wouldn't.
13 Q.  You said that just as a way to try to loosen
14   things up and see if he might talk to you?
15 A.  Right.
16 Q.  Okay.  Didn't work?
17 A.  No, sir.
18 Q.  Okay.  Officer, I'm going to play this
19   videotape. You've viewed this videotape
20   before today, haven't you?
21 A.  Yes, sir.
22 Q.  Does it fairly and accurately depict what
23   transpired out there that evening from the
24   time that it starts until the time it stops?
25 A.  Yes, sir.

1    A.   Yes, sir.

2    Q.   And what did you say into the radio?

3    A.   What I did was I asked the dispatcher to

4         check county wide and see if he had any

5         warrants county wide, that I was headed to

6         the jail with him.

7    Q.   You said 10-8 I believe.  What does that

8         mean?

9    A.   That means in service.

10   Q.   And did you -- I believe I heard you say

11        obstructing?

12   A.   Yes, sir.  I just let the dispatcher know

13        what he was charged with.

14   Q.   So you said 10-8, obstructing?

15   A.   Yes, sir.

16   Q.   All right.  You drive Mr. McLaurine to the

17        county jail?

18   A.   Yes, sir.

19   Q.   What, if anything, happened at the county

20        jail?

21   A.   Once I got Mr. McLaurine inside the booking

22        area of the jail, he -- I started to take the

23        handcuffs off of him.  He turns to me and

24        said, am I charged with a crime?

25             I said, what?

He said, am I charged with a crime?

I said, yes, you're charged.  I said, I charged you out on the scene.

He said, I want to know if I'm officially charged with a crime.

I said, you are under arrest for -- and I told him obstructing governmental operations.

And he said, okay, then I'll do whatever you want me to do.

Q.  Okay.  And so, at that point, did he give you his name?

A.  Yes, sir.  He provided his name, information.

Q.  He provided you his name, his information. Did he tell you what he was doing out there that night?

A.  I think he said something about walking to a restaurant or Subway.

Q.  Walking to Subway?

A.  Yes, sir.

Q.  He told you that when he got to the jail house?

A.  Yes, sir.

Q.  But he wouldn't tell you that at the scene; is that correct?

A.   That is correct.

      MR. WHITE:  I believe that's all I have

         for this officer.

     THE COURT:  All right, sir.

        Cross-examination?

        CROSS EXAMINATION

BY MR. MCLAURINE:

Q.   Officer Bean , did I speak with anyone, to

    your knowledge, besides police officers from

    the moment you contacted me until the moment

    you put handcuffs on me?

A.   No, sir.

Q.   Did you ever explain why you wanted to have

    my identification and what I was doing and my

    name?

A.   Yes, sir, I did.

Q.   What was your explanation?  I don't believe I

    heard any testimony.

A.   One of the things I am explained to you is

    that in that particular neighborhood,

    basically, the crime does go up at that

    particular time of year; that I just can't

    let you walk away, because if something has

    happened, I need to know who you are and how

    to get in touch with you.

1       And I also explained to you that there

2    has been a mysterious death in that

3    neighborhood and that it's still unexplained

4    to this day.

5  Q.  Did you ever offer an explanation that

6    specifically identified something I did as

7    suspicious?

8  A.  I just told you I responded to a suspicious

9    person complaint.

10  Q.  But you can't articulate any particular

11    action that you found suspicious?

12  A.  Yes, sir.

13  Q.  And what was the specific objective fact you

14    found suspicious?

15  A.  That you were walking down an abandoned

16    neighborhood during the time of the year and

17    time of night that we have -- that's when

18    normally our burglars come out.

19  Q.  So that was the only piece of information?

20    There wasn't anything else?

21  A.  Not that I know of.

22  Q.  I would like to ask you a question about a

23    statement you said you read me my rights or

24    something to that effect.  Are you referring

25    to the Miranda, sir?

1    A.    I believed there's a crime afoot.

2    Q.    What was it?

3    A.    The whole investigation was to determine

4          whether or not a crime has been committed.

5    Q.    So did you not have any knowledge that a

6          crime had been committed?

7    A.    No, sir.

8    Q.    Did you have knowledge that a crime was being

9          committed at the moment that you saw me?

10   A.    No, sir.

11   Q.    Did you have knowledge that a crime was about

12         to be committed?

13   A.    That was to be determined.

14   Q.    But you did not have specific knowledge that

15         a crime was about to be committed?

16   A.    No, sir.

17   Q.    You mentioned racial statements that you

18         made?

19   A.    Yes, sir.

20   Q.    Did I give you any reason to believe that I

21         harbored racial sentiments myself?

22   A.    No, sir.

23   Q.    Is it standard practice to interject racial

24         questions into an interrogation?

25   A.    During my 16 years, I have found that certain

1    people respond to certain officers, yes, sir.

2  Q.  Was I one of those certain people you

3      believed that might respond?

4  A.  That's what I was trying to determine.

5  Q.  Did you make any other racial statements that

6      evening?

7  A.  No, sir, not that I know of.

8  Q.  Did you make any other statements about

9      national origin?

10 A.  No, sir.

11 Q.  Did you make any statements using the word

12     Confederate or Confederacy?

13 A.  Yes, sir.

14 Q.  What was the statement you made?

15 A.  I advised you that early in my career I

16     responded to a call with an officer and this

17     particular gentleman had warrants for his

18     arrest.  When that officer contacted him, he

19     told that officer, I refuse to answer any of

20     your questions because I'm part of the League

21     of Confederate States and we do not recognize

22     the laws of the United States.  And he told

23     us our action was illegal.  And I told you I

24     asked you that question to see if, you know,

25     that was your thinking also.

1        MR. MCLAURINE:  I'd like to show you

2             the statute again.  Just turn it

3             on or -- do I need to turn the

4             television on to use this

5             projector?

6        THE COURT:  Yes.  Go ahead.

7        MR. MCLAURINE:  Where is the on

8             button?  Do I need to --

9        MR. WHITE:  Video 1.

10       MR. MCLAURINE:  Video 1?

11  Q.  Officer, what actions did you observe me

12      perform which you consider intimidation?

13  A.  One of the actions you performed was, as I

14      got through explaining to you what may happen

15      to you, you said, Officer, if you're done

16      with me, I'm leaving.  And you tried to walk

17      away.

18  Q.  Did you feel that you were in -- you or any

19      other person was in danger of physical harm

20      by the action that I proposed?

21  A.  Yes, sir.  When you first -- when I first

22      approached you, I got a feeling that

23      basically your actions was not normal.  And

24      that's why I asked you to, you know, see if I

25      could pat you down for weapons.

1      I'm asking is, you were completely stopped

2      from being able to do what you wanted to do?

3  A.  Yes, sir.  I would have let you go free if

4      you had performed this -- if you had complied

5      with the law.

6  Q.  All right.  The first part, intentionally

7      obstructs, impairs, or hinders the

8      administration of law or other government

9      function.

10          THE COURT:  What's the question?

11          MR. MCLAURINE:  I'm go to get to it,

12              sir.

13  Q.  What evidence can you offer that shows a

14      pattern of attempting to obstruct, impair, or

15      hinder?

16          MR. WHITE:  Objection, Your Honor.

17          THE COURT:  Sustained.

18          MR. WHITE:  There's no call for --

19  Q.  I'm sorry.  At any time, did I give you

20      reason to believe that you were not

21      performing a lawful investigation?

22  A.  Yes, sir.

23  Q.  Did you believe my statements to those

24      effects?

25  A.  I don't understand.

1   Q.   Did you consider my communication to be an

2        attempt to mislead you in what I was trying

3        to do?

4   A.   I believed it to be your attempt to hinder

5        the investigation, yes, sir.

6   Q.   I'm not so concerned with did you believe I

7        was telling the truth, that I believed the

8        investigation --

9            MR. WHITE:   Objection.

10           THE COURT:   When are you talking about

11               in time?

12           MR. MCLAURINE:   Sir?

13           THE COURT:   When are you talking

14               about?   Identify the time frame in

15               which you are asking did he

16               believe what you were saying at

17               what time.

18   Q.   The statement that this was an unlawful

19        investigation.   Did you believe I was telling

20        you the truth?

21           MR. WHITE:   Objection.   Calls for a

22               mental operation, Your Honor.

23           THE COURT: Overruled.

24           MR. WHITE:   I'm not sure I understand

25               the question, Your Honor.

1      20 steps?

2  Q.  Okay.  And you stated I was traveling south,

3      which would be toward the top of the map?

4  A.  Yes.

5  Q.  And you approached from your patrol car from

6      the north, from behind me?

7  A.  Yes, sir.

8  Q.  Could you see clear my face before you called

9      to me?

10 A.  Only your profile as you looked toward these

11     buildings.

12 Q.  You stated earlier I was looking in the

13     direction of houses?

14 A.  Yes, sir.

15 Q.  Were you able to observe me looking at any

16     specific house?

17 A.  I didn't make a mental note of it, no, sir.

18          THE COURT:  Anything further?

19          MR. MCLAURINE:  I -- No, sir.

20          THE COURT:  All right, sir.  Anything

21              further, Mr. White?

22          MR. WHITE:  No redirect at this time.

23          THE COURT:  All right.  Step down,

24              Officer, go back to the witness

25              stand.  Anyone need a break?  All

1    right.  If you need a break, raise

2    your hand.  All right.  Call your

3    next witness.

4    MR. WHITE:  City calls Lt. Matthews.

5    WILLIAM MATTHEWS

6    The witness, having first been duly

7    sworn to speak the truth, the whole truth and

8    nothing but the truth, testified as follows:

9    THE COURT:  Take your seat there and

10    speak directly into that

11    microphone.

12    DIRECT EXAMINATION

13    BY MR. WHITE:

14    Q.   State your name, please, sir.

15    A.   William Matthews.

16    Q.   How are you employed?

17    A.   I'm a lieutenant with the City of Auburn

18    Police Department.

19    Q.   How long have you been employed with the City

20    of Auburn as a police officer?

21    A.   Since 1992.

22    Q.   And how long have you been in law enforcement

23    in general?

24    A.   Fourteen years.

25    Q.   And you are now a lieutenant; is that

1      correct?

2    A.   That is correct.

3    Q.   Back on November 27, 2004, what was your

4         rank?

5    A.   Sergeant.

6    Q.   Let me direct your attention to that -- to

7         the early morning hours of November 27 and

8         ask, you did you have an occasion to be

9         involved in this investigation regarding

10        Mr. McLaurine?

11   A.   I did.

12   Q.   And how is it that you became aware of what

13        was going on out there?

14   A.   I was the shift supervisor that night and was

15        called to the scene by Officer Bean.

16   Q.   Officer Bean called you to the scene?

17   A.   He did.

18   Q.   Okay.  And do you recall where you were when

19        you first got the call?

20   A.   I was near the intersection of West Magnolia

21        and Donahue Drive.

22   Q.   And did you respond immediately upon

23        receiving the call?

24   A.   I did.

25   Q.   Okay.  And were you in a marked patrol car?

1    A.   It's what we call a semi-marked patrol car.

2         It's black and white, but it doesn't have a

3         light on top.

4    Q.   And were you in uniform that evening?

5    A.   I was.

6    Q.   And did you respond to that location where

7         Mr. McLaurine was located?

8    A.   I did.

9    Q.   What, if anything, did you do upon arriving

10       there at the scene?

11    A.   I spoke with Officer Bean about the

12       situation; you know, why he needed me there.

13       And then after getting the information from

14       Officer Bean, I spoke with Mr. McLaurine.

15    Q.   Okay.  What did you say to Mr. McLaurine?

16    A.   I asked him basic questions; what was his

17       name, where did he live.  And then after

18       getting no response or being told --

19    Q.   Let me ask you this.  When you asked him

20       those questions, how did he respond to you?

21    A.   He told me that he didn't think that he

22       needed to provide that information.

23    Q.   Didn't think he needed to provide that

24       information?

25    A.   That is correct.

Q.   Okay.   How many times did you go through that
     series of questions with Mr. McLaurine in an
     effort to gather that information?

A.   I would say that I probably asked him
     somewhere around four or five times from the
     beginning, where I just asked him his name to
     the end where I was telling him that if he
     didn't provide it, that he was breaking the
     law and would subsequently be arrested.   I
     gave him every opportunity to comply.

Q.   And was there some conversation that y'all
     had where he acknowledged you as a police
     officer and acknowledged your authority to
     ask him those questions and he stated that he
     refused to answer those questions?

A.   Yes, sir.   I explained the law to him,
     explained that we had reason to contact him.
     I gave him the reason that we did contact
     him.   I explained to him that it was his
     obligation to give us that basic identifying
     information if it was requested of him.   And
     he would not.

Q.   And you say you explained to him the reason
     that you did contact him.   What did you tell
     him in that regard?

130

1   A.   That we had received a call for service

2        giving a description that fit his.

3            MR. MCLAURINE:  Objection, hearsay.

4            THE COURT:  Overruled.

5   Q.   Go ahead.  If you would give the entire

6        description that you were given as part of

7        dispatch?

8   A.   Well, I wasn't actually dispatched to the

9        call originally.

10  Q.   Okay.

11  A.   But I knew that he -- that Officer Bean had

12       been dispatched to that area in reference to

13       a suspicious subject and that Officer Bean

14       had contacted a subject matching that

15       description.

16  Q.   And you explained to him that because of

17       that, you had a right to ask him his name,

18       his address, what he was doing?

19  A.   I told him that all he had to do was provide

20       his name and his address, and as long as he

21       wasn't wanted on a warrant, wasn't a career

22       burglar or a terrorist, he would be free to

23       leave.

24  Q.   And even after you told him that, he refused

25       to give you the information?

1    A.    That is correct.

2    Q.    Okay.  Was there some discussion about a

3          recent United States Supreme Court decision?

4    A.    There was.

5    Q.    Who brought that up?

6    A.    I did.

7    Q.    What was said in regards to that?

8    A.    When he told me that he didn't think we had

9          the right to elicit that information from him

10         I, explained that there had recently been a

11         Supreme Court decision that affirmed that a

12         police officer had the right to ask those

13         questions, and that it was the duty of the

14         person being stopped to answer.  He said that

15         he was aware of that but disagreed.

16   Q.    He told you that he was aware of that

17         decision but that he disagreed with the

18         decision of the United States Supreme Court?

19   A.    That is correct.

20   Q.    And the name of that decision, the case that

21         y'all were talking about, was Hiibel; is that

22         correct?

23   A.    That is correct.

24   Q.    And that's the name of one of the litigants

25         in that case was H-I-I-B-E-L?

1    A.   Correct.

2    Q.   And so Mr. McLaurine, when you approached

3         him, he was familiar with Supreme Court case

4         law on the very subject on which you were

5         stopping him for; is that correct?

6    A.   He said he was.

7    Q.   Okay.  He -- and he stated to you that he

8         disagreed with the decision of the United

9         States Supreme Court as to the Hiibel case?

10   A.   He said that he disagreed with the

11        interpretation.

12   Q.   The interpretation?

13   A.   Interpretation.

14   Q.   All right.  So what, if anything, did you do

15        after Mr. McLaurine repeatedly refused to

16        answer your questions?

17   A.   After we had gone through that for several

18        minutes, I called the shift commander, who

19        was Lt. Howell, asked him to respond to the

20        scene so that I could discuss a plan of

21        action with him.  I had already made up my

22        mind that if he didn't comply, that we would

23        place him under arrest, but I wanted to talk

24        to the shift commander and see if he had any

25        alternatives other than what I was thinking.

1  immediately prior to beginning your wait for

2  Lt. Howell?  Do you remember there being a

3  discussion about Mr. McLaurine's desire to

4  leave?

5  A.  Yes.  Just prior to me walking away from him

6  to call Lt. Howell, he said that he was going

7  to leave.  And I told him that he could not

8  leave.  And he said that he was going to

9  leave unless he was being detained, and I

10  told him to consider himself detained at that

11  time.

12  Q.  And what did he say after that?  After you

13  said consider yourself detained, what did he

14  say?

15  A.  I said, now are you going to stay here?

16  And he said, no; unless you physically

17  detain me, I'm going to walk away.

18  And so I placed my left hand on his

19  right arm, and I said, consider yourself

20  physically detained.  And I instructed

21  Officer Bean to keep him there until I

22  returned.

23  Q.  Okay.  And you've seen the video in this

24  case, have you not?

25  A.  Yes, I have.

1   Q.   And what you have just described occurred

2        immediately prior to the video being

3        activated by Officer Bean; is that correct?

4   A.   That is correct.

5   Q.   So that's why we see Officer Bean standing

6        there side by side with Mr. McLaurine in

7        front of the car is because you have

8        instructed Officer Bean to make sure he

9        doesn't leave?

10  A.   That is correct.

11  Q.   Okay.  All right.  So what happened -- what

12       happened when Lt. Howell arrived at the

13       scene?

14  A.   Lt. Howell approached him, basically went

15       through the same statement or conversation

16       that he and I -- that Mr. McLaurine and I had

17       had.

18  Q.   Which was what?  If you would, just to the

19       best of your recollection, what did you hear

20       Lt. Howell say to the defendant?

21  A.   He basically told him that he had to give us

22       that information and that if he didn't, then

23       he would be arrested and taken to the county

24       jail.

25  Q.   Okay.  And did he respond -- did the

1       defendant respond to Lt. Howell?

2  A.  He told him that he understood that, but he

3      did not feel like he had to give that

4      information.

5  Q.  Didn't feel like he had to give that

6      information?

7  A.  That is correct.

8  Q.  And so he didn't -- ultimately did not

9      provide that information?

10  A.  That is correct.

11  Q.  So what happened after that?

12  A.  He was placed under arrest by Officer Bean.

13      Shortly or immediately after arrest, we

14      retrieved his wallet from his back pocket,

15      located his identification, checked him for

16      wants and warrants and transported him to the

17      county jail.

18  Q.  So after you arrested him, you did a pat-down

19      search -- you are authorized by law to pat

20      him down and retrieve any objects in his

21      pockets, and you got his wallet out at that

22      point after he was placed under arrest?

23  A.  That is correct.

24  Q.  And he had an identification card in his

25      wallet?

1    A.    He did.   A Colorado identification card.

2    Q.    And is that you we hear on the video calling

3          in a McLaurine ID card?

4    A.    That is correct.

5    Q.    And that happened immediately after he was

6          arrested and you retrieved his wallet?

7    A.    Correct.

8    Q.    Now, did you go with Officer Bean to the

9          jail?

10   A.    I did not.

11   Q.    I believe that's all I have at this time.

12              THE COURT:  All right.  Cross-

13                  examination?

14                  CROSS EXAMINATION

15   BY MR. MCLAURINE:

16   Q.    After you have physically contacted me, did I

17         disobey any direct command involving my

18         physical body as to where to stand, what to

19         do, how to position myself?

20   A.    After I contacted you?

21   Q.    Yes, sir.

22   A.    Just the part where you and I discussed

23         whether you were going to stay or leave.

24         After you were told that, you were being

25         detained.

1          microphone.

2              DIRECT EXAMINATION

3   BY MR. WHITE:

4   Q.   State your name, please, sir.

5   A.   It's Lt. Keith Howell.

6   Q.   How are you employed?

7   A.   I'm the shift commander on the 18 -- night

8        shift at that particular time.

9   Q.   Auburn Police Department?

10  A.   Auburn Police Department, yes, sir.

11  Q.   How long have you been employed in law

12       enforcement?

13  A.   24 years and 4 months.

14  Q.   And how -- at the time this incident

15       occurred, how long had you been lieutenant

16       shift commander?

17  A.   When I took the shift.

18  Q.   Well, how long have you been lieutenant?

19  A.   Eight years.

20  Q.   Okay.  Let me direct your attention to that

21       evening of November 27, 2004, early morning

22       hours.  Do you recall being called to the

23       location where these other officers had

24       detained Mr. McLaurine?

25  A.   Yes, I do.

1   Q.   And how was it that you were called to
2        respond to that location?
3   A.   My sergeant at the time, Matthews, called me
4        on my Southern Linc two-way radio, advised me
5        that they was out on a subject that was
6        refusing to give them his name and address.
7   Q.   All right.  And did you respond to that
8        location?
9   A.   Yes, sir, I did.
10  Q.   Okay.  And on your way -- Where were you when
11       Sgt. Matthews called you?
12  A.   When I was coming back from the hospital on a
13       previous call and I was on Opelika Road.
14  Q.   So it took you a little while to get there?
15  A.   About three or four minutes, yes, sir.
16  Q.   And during the time that you were en route,
17       were you talking with Lt. Matthews --
18       Sgt. Matthews about the situation there?
19  A.   Yes, sir, I was.
20  Q.   And did he explain to you the situation where
21       Mr. McLaurine was being asked to provide his
22       name and information and reason for him being
23       in that area, and he was refusing to give
24       that information?
25  A.   Yes, sir.

1   Q.   Okay.  And did he also provide to you -- did
2        Sgt. Matthews also provide to you the reason
3        why they had Mr. McLaurine detained?
4   A.   Yes, sir.  I actually heard the reason on
5        call get put out about the suspicious male
6        carrying something in his hands and looking
7        at -- at houses.  So I actually heard the
8        original call.
9   Q.   So you were familiar with their purpose for
10       being out there?
11  A.   Yes, sir.
12  Q.   And you responded to the location.  What
13       did -- What did you first do when you arrived
14       there at the location?
15  A.   When I got out of my vehicle, I went to the
16       front of the car where Officer Bean and
17       Mr. McLaurine was at and Sgt. Matthews was
18       at.
19  Q.   Let me stop you right there.  What kind of
20       vehicle were you driving that night?
21  A.   I was a unmarked Crown Vic, light green in
22       color.
23  Q.   And how were you dressed that evening?
24  A.   In a police uniform just like Lt. Matthews?
25  Q.   So not like you're dressed today?

1   A.   No, sir.

2   Q.   And so approached Mr. McLaurine and Officer

3        Bean; is that correct?

4   A.   Yes.

5   Q.   Okay.  And what, if anything, did you say to

6        Mr. McLaurine at that time?

7   A.   I asked him was he familiar with the law

8        about compelling you to give your name and

9        your address to a law enforcement officer.

10       He said, yes, I am familiar with that; I

11       don't agree with that law.

12       I said, well, are you going to give your

13       name to us?

14       And he said no.

15       And I said, you know you will be

16       arrested if you do not give us your name.

17       He goes, well do whatever you want to

18       do.

19       And at that particular time I told him

20       he was under arrest.

21       MR. WHITE:  Okay.  That's all I have.

22       THE COURT:  All right.  Cross-

23            examination?

24            CROSS EXAMINATION

25  BY MR. MCLAURINE:

# EXHIBIT "B"

# DEPOSITION OF
# WILLIAM S. MCLAURINE, II

# ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

1
2
3
4
5 WILLIAM S. MCLAURINE, II,

6      Plaintiff,

7 Vs.

                           CIVIL ACTION NO.
                           3:06-CV-1014 MEF

8 CITY OF AUBURN, AL., unnamed
police dispatcher, deputy director
9 BENJAMIN WALKER, OFFICER LAVARRO
BEAN, LIEUTENANT MATTHEWS, LIEUTENANT
10 KEITH HOWELL, CHIEF FRANK DEGRAFFENRIED,
DAVID WATKINS, director "BILL" JAMES
11 and City Manager CHARLES DUGGAN,

12      Defendants.

13

14         * * * * * * * * * * * *

15     **DEPOSITION OF WILLIAM S. MCLAURINE**, II, taken

16 before Pamela A. Wilbanks, Registered Professional

17 Reporter and Commissioner for the State of Alabama at

18 Large, in the City of Auburn Meeting Room, 122

19 Tichenor Avenue, Auburn, Alabama, on Wednesday, March

20 21, 2007, commencing at approximately 11:30 a.m.

21

22        * * * * * * * * * * * *

23

## WILLIAM S. MCLAURINE, II

1

2  The witness, after having first been duly

3  sworn to speak the truth, the whole truth and nothing

4  but the truth testified as follows:

5  ### EXAMINATION

6  BY MR. MORGAN:

7  Q.  Mr. McLaurine, I'm here taking your

8      deposition.  I'm not sure -- Do you know what

9      a deposition is?

10 A.  I believe this is a legal formal statement of

11     facts and your ability to question me, and I

12     have to respond.

13 Q.  That's fine.

14     State your name for the record.

15 A.  William Sandlin McLaurine, II.

16 Q.  And your date of birth?

17 A.  February 14, 1972.

18 Q.  And your social?

19 A.  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.

20 Q.  Now, where were you born?

21 A.  Virginia.  Petersburg, I believe.  I'm not 100

22     percent positive on that.

23 Q.  And I understand you do not have a driver's

1    license?

2    A.    At this time, no, sir.  I am in the process of

3          attempting to get one.

4    Q.    Do you have an ID card?

5    A.    Yes, sir, I do.

6    Q.    Let's see what that number is.  I guess that's

7          an "L"?

8    A.    "I".  I 179793.

9    Q.    It shows that your height is five foot eight?

10   A.    Correct.

11   Q.    And your weight is about 215 pounds?

12   A.    Probably closer to 100 right now, but yes,

13         sir.

14   Q.    And this has your address as 222 Tichenor

15         Avenue, Apartment 4?

16   A.    Auburn, Alabama 36830.  That is correct.

17   Q.    How long have you lived there?

18   A.    Let's see.  I believe roughly August of 2005,

19         but let me think about that.  Yes, that's

20         correct.

21   Q.    You were not living at this address at the

22         time of this incident?

23   A.    No, sir.  At the time of this incident, I was

1   that conclusion until after I was arrested,

2   because as I testified before, I honestly

3   believed that the police had no right to hold

4   me.  And when I told Officer Bean and Officer

5   Matthews that you can either physically detain

6   me or I'm going to start walking in this

7   direction, that I was going to walk away.  I

8   had no indication about any future action at

9   that time or had not made any decisions at

10  that time either.  But after I was arrested, I

11  distinctly came to the conclusion that I was

12  going to sue.

13  Q.   Let me be clear.  I think you just testified

14  to something, and I wanted to be sure on it

15  just to double-check.

16      You did not stop the first time that

17  Officer Bean requested you to stop, did you?

18  A.   That's correct.

19  Q.   You stopped --

20  A.   I don't know that he said stop.  He said,

21  excuse me, sir, and I kept going.

22  Q.   Whatever he said, you did not stop and comply?

23  A.   That's true.

1   A.   No.

2   Q.   Were there any other commercial stores in

3         eyesight from where you were stopped?  Gas

4         stations, Spectrums, Krogers?  Anything you

5         could see from where you were?

6   A.   Just the university.

7   Q.   And my understanding is this was, what, during

8         Thanksgiving?

9   A.   Friday night of the Thanksgiving -- Friday

10        night/morning of the Thanksgiving break.

11   Q.   Right at midnight?

12   A.   Right.

13   Q.   I assume you didn't see any activity going on

14        at the university.

15   A.   No.

16   Q.   So the second time that Officer Bean requested

17        you to stop, tell me -- pick up there and tell

18        me what happens.

19   A.   He said excuse me.  I think he said excuse me,

20        sir.  Repeated that, and I stopped.  I don't

21        recall the exact wording of what his initial

22        request was.

23   Q.   Was he polite to you when he asked you to stop

1    those first two times?

2  A.  Yes.  In fact, he was very polite and probably

3    the most polite officer up until he made the

4    racial comments.  I remember the first thing I

5    asked him was -- when he asked for

6    identification was why do you want to know.

7    And his response was, because we got a call

8    about somebody carrying something.

9  Q.  Now, why didn't you comply at that point?

10  A.  Because I did not believe that was a

11    sufficient reason to require me to comply.

12  Q.  So what?

13  A.  First of all, the other issue I understood to

14    be was that I was not legally required to

15    present it in that particular situation.

16  Q.  Mr. McLaurine, I'm not -- I don't mean to

17    interrupt, but that's based on your legal

18    opinion of cases that you've read.

19  A.  Right.

20  Q.  My question, aside from your legalese or legal

21    training, why didn't you comply?

22  A.  Because --

23  Q.  It's midnight.  You're on the street by

1    Q.    And you thought that if you refused to give

2          your identification to Officer Bean that

3          somehow this was going to get back to the

4          Auburn Police Department and no one was going

5          to stop and question you ever again?  Was that

6          your thought process?

7    A.    I didn't really know.  I knew that there

8          wasn't a legal requirement and that if I were

9          to walk away --

10   Q.    Can we agree that you are wrong on that?

11   A.    No.  I disagree and I still have my case to

12         appeal.  There was no articulation of

13         suspicion against me.  And Officer Lavarro

14         Bean's testimony -- I specifically asked him

15         what reason did you believe for me to be -- to

16         suspect me of committing a crime.  And he said

17         nothing, of committing a crime, present tense,

18         nothing, and that I was about to commit a

19         crime.  That's what we were here to find out.

20         He still has not presented in my opinion legal

21         reasonable suspicion.

22   Q.    In your opinion.  All right.

23              And did you think -- did you realistically

118

1    think that the quickest way for you to get to

2    Subway was to refuse to comply with the police

3    officer's order?

4    A.    Yes, sir.

5    Q.    Have you ever in the real world -- TV, radio,

6          newspaper -- ever known anybody that was able

7          to just leave without complying with a police

8          officer's order?

9    A.    Yes, sir.

10   Q.    When?

11   A.    CSI.   It was a case --

12              I don't know the specific case.   You did

13         ask about TV.

14   Q.    Yeah.

15   A.    The individual basically -- The police had

16         some questions.   And the police officer said,

17         look, if you want to arrest me, okay; if you

18         don't, let me go.   And when I specifically

19         gave the statement I gave to the police

20         officer, that's what I was attempting to

21         communicate.

22   Q.    And in the CSI case, did the police have the

23         person's name?

119

1   A.   I believe they might have.

2   Q.   So you are asked to stop twice.  Do the second

3        time.  He wants some identification.  You ask

4        him why he wants to know.  He tells you that

5        he had had a call about somebody carrying

6        something, and then what happens?  You don't

7        comply.  He continues to ask you to comply.

8   A.   They continue to state their belief that a

9        police officer in uniform has the right to

10       stop someone irregardless of the situation.

11  Q.   Well, so what happens?  Doesn't someone else

12       arrive about the same time?

13  A.   Yes, sir.  At some point Officer Matthews

14       showed up.

15  Q.   Is there another officer before Matthews that

16       showed up?

17  A.   I don't believe so, no, sir.  There may have

18       been some officers in the periphery because

19       after a while, I noticed there was more than

20       one, but no one else I believe directly

21       approached me.

22  Q.   Let me just kind of paraphrase this.  Other

23       than conversations with Officer Bean prior to

122

1    Q.    He didn't ask you.    He asked Bean?

2    A.    Right.

3    Q.    Were you recording it?

4    A.    No, sir.

5          And Officer Bean touched his microphone on

6    his radio thing and indicated that he was

7    recording it.

8          Other than that, Officer Matthews

9    basically again attempted to communicate the

10   fact that when you are -- his belief, that

11   when you are stopped by the police, you have

12   to provide this information regardless of the

13   situation and -- whenever they contact you,

14   that was another phrase that was used by

15   Officer Perkins in the first stop kind of

16   issue -- and reiterated that particular

17   issue.    And I went on to say that I disagreed

18   and that I didn't find that the reasons they

19   presented to me at the time were to be

20   sufficient for me to even consider it.

21   Q.    And Sergeant Matthews asked you to comply

22   you've already testified, and you did not

23   comply with his request.

123

1   A.   That's correct.

2   Q.   In your legal research, did you draw any

3        distinction between somebody that was just

4        stopping you for purposes of asking questions

5        or somebody that was stopping you for an

6        arrest?  Did you ever draw any distinction

7        between those?

8   A.   Yes, sir.

9   Q.   At some point were you moved over in front of

10       the police car?

11  A.   Yes, sir, I was.

12  Q.   Was that when Sergeant Matthews was there?

13  A.   Yes, sir.

14  Q.   Before Lieutenant Howell arrived?

15  A.   Correct.

16  Q.   Anything else of any significance to this case

17       that occurred when it was you, Officer Bean

18       and Sergeant Matthews?

19  A.   I indicated to them that we were at an impasse

20       and that I was going to continue walking down

21       the street.  And I pointed with both fingers

22       like this, I guess L-shaped, in the direction

23       of travel that I was originally making.

124

1    Unless you physically detain me, I'm going to

2    start walking this way, kind of statement.

3    And it was -- basically they both got a

4    shocked look on their face, and they didn't

5    say anything. I took one step, and they both

6    grabbed me, one officer on each arm.

7  Q.  Did they hurt you?

8  A.  No, sir. I believe the officer on my left --

9    that may have been Officer Bean -- put a very

10    limp wrist lock on me, and it was -- I didn't

11    resist or do anything like that so it was more

12    of a form than any kind of pressure.

13  Q.  Nobody hurt you when that happened?

14  A.  No, sir.

15  Q.  Anything else of significance when Sergeant

16    Matthews was there?

17  A.  Not that I can recall.

18  Q.  And then Lieutenant Howell shows up?

19  A.  This was after the questioning period when

20    Officer Matthews and Officer Bean and -- I

21    think there was some other officers on scene.

22    And this was the period in which I had stopped

23    responding to most questions from Officer

1    Bean. It was during this period that he

2    made -- asked the questions, is it because I'm

3    black? What nation do you work for? Is it

4    because you work for the Confederate

5    government? because I know some people who

6    do.

7        The first one was a pretty -- the thought

8    going through my mind was, why does it always

9    have to be about race. It was almost kind of,

10    this is just unbelievable. But when the

11    question got to, is it because you work for

12    the Confederate government, because I know

13    some guys who do, that one, I became afraid,

14    the feeling you get on the back of your neck

15    like when your hairs go up. It was very

16    spooky because, in my opinion, at this point

17    the police officer was well outside the law in

18    what he was allowed to do and ask. And for a

19    brief moment I was like, these guys can do

20    anything they want to me. The fact that they

21    all had guns and -- For a brief second, the

22    image of being drug off somewhere came into my

23    head. It was very brief, not very long. But

126

1    the whole concept of these guys have no

2    respect for the law came into my head, that

3    particular aspect of the incident.   Then

4    Officer Howell showed up.

5  Q.   Let's get back to that.

6        Now, at the time that you testified that

7    Officer Bean makes these statements, is this

8    after you had indicated you were going to

9    leave and they very gently put their hands on

10   you and said --

11 A.   Yes.

12 Q.   Was anybody holding on to you at the time?

13 A.   At the time that he made those statements, no.

14 Q.   Were you cuffed?

15 A.   No, sir.

16 Q.   And there was you, a white male --

17 A.   I was standing in front of the car.  Officer

18       Bean is standing to my right.

19 Q.   And you've seen the video, have you not?

20 A.   Yes, sir.

21 Q.   And it never shows Officer Bean having any

22       physical contact with you on the video.

23 A.   I think he may have touched me when he first

127

1     had me step into camera view, but other than

2     that, it was a guiding --

3  Q.  And it's while he's standing there that he's

4     having this conversation with you that you

5     claim is racial discrimination?

6  A.  Yes, sir.

7  Q.  And Sergeant Matthews is out there.  Is he a

8     white male?

9  A.  Yes.

10  Q.  Were there any other officers out there that

11     you recall?

12  A.  That would have been in earshot of

13     conversation, I can't say.  No.

14  Q.  Now, what is it that Officer Bean says that

15     causes you to sue him for racial

16     discrimination?

17  A.  Those specific statements, those aspects

18     concerning --

19  Q.  One of them is, are you not answering my

20     questions because I'm black?

21  A.  Correct.

22  Q.  What is there about that that makes -- How do

23     you interpret that as being racially

1          discriminatory?

2     A.   Because it assumes because I'm white that I'm

3          a racist.

4     Q.   Was it fair to say that Officer Bean didn't

5          know who you were?

6     A.   I believe so.  I don't know that --

7     Q.   Did you know him?

8     A.   Not previous to this, no.

9     Q.   And because he asked you, are you not

10         answering these questions because I'm black,

11         you thought he thought you were a racist?

12    A.   Yes, sir.

13    Q.   Did the thought ever cross your mind that he

14         might just be asking you that trying to find

15         out some reason why you weren't complying with

16         everybody's orders?

17    A.   The only legitimate reason I can think for

18         asking that question is, is it because I'm a

19         racist and I don't want to cooperate with a

20         black police officer.  That's the only thing I

21         can think of.

22    Q.   By that time you had not answered Sergeant

23         Matthews either, had you?

129

1    A.    That's correct.

2    Q.    And you have no training in interrogation or

3          any of that, do you?

4    A.    No, sir.

5    Q.    Never interrogated anybody --

6    A.    No.

7    Q.    -- that was under arrest?

8    A.    No.

9    Q.    Never interrogated anybody that was not being

10         compliant with an order from a police officer?

11   A.    No.

12   Q.    And then he asked you what, what nation are

13         you with?

14   A.    Correct.

15   Q.    Do you consider that to be racially

16         discriminatory?

17   A.    No.  That is from -- On its face value, I

18         don't consider it to be that.  In context with

19         the Confederate statement, I believe it may

20         have been an allegation that I was someone who

21         was working for the Confederate government or

22         a traitor to this nation and that -- The

23         reason he was asking that particular set of

130

1       questions, again, it appears is because I'm

2       white.  His specific --

3   Q.  Do you think he might have been asking just

4       because you weren't cooperating?  Let's back

5       up.  The answer to this question is very

6       clear.

7            You were asked all of those questions by

8       Officer Bean because you did not comply and

9       give your name and address, true?

10  A.  True.  And one of the statements I gave to him

11      about why I didn't do it was because I did not

12      believe he had the legal authority to do it.

13  Q.  Taking that a step further, is it your opinion

14      that anytime somebody is stopped and that

15      person decides, hey, in my opinion the police

16      officer doesn't have the right to arrest me,

17      that they do not have to submit to an arrest

18      or questioning by the police officer?

19  A.  Let me clarify the specifics of that.  In

20      general, yes.  When the police officer tells

21      you that he's going to arrest you and he's

22      going to physically detain you and you are

23      made aware that you are going to be physically

131

1   detained, then in order for his own personal

2   safety he has the right to basically arrest

3   you.  At that point the decision about whether

4   it was reasonable belongs to a judge at a

5   different time and location.  Under no

6   circumstances did I resist or not follow his

7   instructions over physical control of my

8   body.  All right?  But when a police officer

9   just walks up out of the blue and says, I want

10   you to answer some questions and you have to,

11   I do not believe that is legal.

12   Q.   And you recognize the fact that in this day

13        and time, there are, in fact, individuals and

14        organizations in the United States who do not

15        feel like they have to comply with

16        authoritative figures, true?

17   A.   There are individuals, yes.

18   Q.   And what was offensive to you about being

19        asked if you were a member of the Confederate

20        government as you've testified?

21   A.   Again, it comes back to the generalization of

22        individuals involved with the word

23        "Confederate" or individuals who want to -- I

132

1    don't know -- resurrect or participate in the

2    Confederate government, which was a separate

3    government from the United States of America.

4    And the racial aspect of it appears as though

5    because I'm white that Officer Bean -- I

6    didn't want to agree with him that I fell into

7    that category of individual. But the

8    assumption on this is that there was nothing I

9    said, nothing I specifically indicated to him

10    to indicate that I was anti-government, simply

11    the fact that I was white.

12  Q.    Well, in fact, you were anti-government,

13    weren't you?

14  A.    No, sir. I believe strongly in the

15    constitution and in the powers of government

16    delineated in it and that the right to

17    exercise the rights guaranteed in it are part

18    of that government. If I had been completely

19    anti-government, I would have possibly

20    responded physically and violently against the

21    police officers. I would not have offered

22    under protest the first time I was stopped

23    when I protested. I had proceeded in every

133

1    manner with as much care and caution as I can

2    to ensure that my rights are preserved.

3  Q.  Is there any other thing that Officer Bean

4    said or did that you think throughout the

5    whole event of that evening was racially

6    discriminatory towards you?

7  A.  No.

8  Q.  Other than asking you these three questions?

9  A.  Those three questions.

10  Q.  And if a white officer asked a black detainee,

11    are you a member of a black Muslim

12    organization, do you think that would be

13    racist?

14  A.  Yes.

15  Q.  Just because the questioner is one race and

16    the detainee is another race?

17  A.  If the officer had some particular suspicion

18    that the individual was involved with a group

19    that could be associated with criminal

20    elements and that association would be linked

21    to specific crimes involving that specific

22    individual, I think it would be a fair

23    question.  But just to come out and ask, do

137

1    decided you wanted to be arrested so that you

2    could take this matter to court?

3  A.  I didn't want to be arrested.  Okay?  I wanted

4    to be on my way, and I made multiple attempts

5    to leave the scene.

6  Q.  You've told me about one.

7  A.  Well, I made that attempt, and I consider the

8    other compliance.  And that particular

9    action was -- I honestly still, when he said

10   yes -- When I told him yes, that you [sic]

11   understand this, I basically still didn't

12   believe they were going to go through with

13   this.  I still thought up until the moment

14   they put the handcuffs on me I had the

15   opportunity to walk away, that this was really

16   just a big intimidation tactic.

17 Q.  Up until the time you were placed under

18   arrest, you did have the opportunity to walk

19   away by complying with their request, didn't

20   you?

21 A.  I guess I could have complied and walked away.

22 Q.  Now, did Officer Bean cuff you?

23 A.  I think so.

138

1   Q.   Do you have any complaints about the way you

2        were cuffed?

3   A.   It was a little tight, but I'm not going to

4        complain about it or raise -- I don't intend

5        to.

6   Q.   And then you were transported from the scene

7        to where?

8   A.   Lee County Justice Center.

9   Q.   And in whose vehicle were you in?

10   A.   In Officer Bean.

11   Q.   Do you have any complaints about the manner in

12        which you were transported from the scene to

13        the Lee County Justice Center?

14   A.   It wasn't pleasant, but I don't intend to

15        raise --

16   Q.   Well, did anything happen to you?

17   A.   No.

18   Q.   Were any police officers -- Other than your

19        interpretations of the questions from Officer

20        Bean, were any of the police officers

21        disrespectful or mistreat you in any way?

22   A.   I would go so far as to say that Officer

23        Matthews wasn't necessarily polite, but I

139

1    wouldn't -- there's nothing in any of the

2    treatment that I received beyond what I've

3    already talked about that I'm going to raise a

4    complaint about.

5  Q.  And what happened when you got to the Lee

6    County Justice Center?

7  A.  At this point I began to realize, all right,

8    maybe they are going to arrest me.  We got

9    into the situation, and as soon as it was

10   clear that Officer Bean was going to actually

11   book me, then I then gave my identification

12   and complied with his requests.

13  Q.  Did you do that in an effort to not be

14   arrested?

15  A.  No, sir.  I did that because at this point I

16   thought I had been arrested.

17  Q.  And what happened when they got to Lee

18   County?  They turned you over to the county?

19  A.  Officer Bean was involved in booking and, yes,

20   I made bail the next morning.

21  Q.  Did you have to stay in overnight?

22  A.  Yes, I did.

23  Q.  You made bail and got out.

1          When Officer Bean got there and completed

2      the paperwork, did he turn you over to the Lee

3      County Justice folks?

4  A.   I believe so.  He fingerprinted me and all

5      that.  He started that process, and then at

6      some point, yes, I was turned over to them.

7  Q.   Have you got any complaints about your

8      treatment in the jail by Officer Bean?

9  A.   No.

10  Q.   Do you have any complaints about your

11      treatment in the jail by any members of the

12      Lee County Justice Department?

13  A.   Other than having to be there, no.

14  Q.   And then eventually you went to court

15      representing yourself in city court?

16  A.   Correct.

17  Q.   And was found guilty?

18  A.   Correct.

19  Q.   Had a trial?

20  A.   Correct.

21  Q.   At which you testified, true?

22  A.   True.

23  Q.   And had the opportunity to cross-examine folks

1    that testified?

2  A.  No.

3  Q.  You were not allowed to cross-examine at city

4      court?

5  A.  Yes.  I believe it's in the city court

6      record.  I was trying to find out what

7      observations that Officer Bean had made of me

8      in order to determine reasonable suspicion,

9      what independent observations he had done to

10     indicate I was a suspect worthy of being

11     stopped.  Prosecutor Rick Davidson indicated

12     that he felt such an action was pursuant to

13     civil and not criminal line of questioning.

14     And Just Bean denied me -- Judge Bailey denied

15     me the ability to question Officer Bean

16     concerning what particular actions he had

17     taken to determine that it was reasonable to

18     stop me.

19 Q.  Could you question him on other things?

20 A.  Yes.

21 Q.  So that was really an evidentiary ruling by

22     Judge Bailey?

23 A.  It prevented me from getting the information,

142

1      but yes.

2   Q.   And you were found guilty?

3   A.   Yes.

4   Q.   And then you appealed to circuit court?

5   A.   Correct.

6   Q.   And you understood that the trial before

7        circuit court is what's called de novo?

8   A.   Yes.

9   Q.   Nothing that happened at city court was

10       admissible at circuit court?

11  A.   Yes.  That I understand.

12  Q.   You started all over?

13  A.   Correct.

14  Q.   So you were not prejudiced in any way by any

15       of your complaints about what happened at city

16       court in terms of your trial at circuit court,

17       true?

18  A.   Okay.  I'll say that, yes.

19  Q.   And then when you got to circuit court, you

20       initially had a court-appointed attorney?

21  A.   Correct.

22  Q.   You were determined to be indigent?

23  A.   Yes.

151

1    a specific case I needed to see that I believe

2    she recommended was Harris.  I could be wrong

3    about that.  I did not have the money, and I

4    really did believe that I was not guilty and

5    that I would be found not guilty based on the

6    facts and that I had the proper legal

7    argument.

8  Q.  Of course you went to trial and were found

9      guilty?

10 A.  Correct.

11 Q.  And then you appealed that, and the conviction

12     has been affirmed by the Court of Criminal

13     Appeals?

14 A.  That is the current state of the appeal, yes.

15 Q.  Let me ask you about some of these individuals

16     you've sued so I can be sure I understand what

17     you claim they've done wrong.

18         You filed a motion to amend to add the

19     dispatchers.

20 A.  Correct.

21 Q.  Tell me what it is that you think the

22     dispatchers did wrong.

23 A.  The dispatcher did not identify a specific

1    crime.  In addition to that, there is a

2    section of audiotape from when the dispatcher

3    contacted Officer Bean.  In that contact he

4    made the statement something to the effect of,

5    there's somebody looking at houses.  He's

6    saying that the caller said this particular

7    action, that it is somebody looking at

8    houses.  That's not what the caller said.  The

9    caller clearly does not mention houses or what

10   the individual was looking at.  That was an

11   error of introduction by him.

12       The other thing about it was that after

13   the police -- after Officer Bean contacted

14   me -- arrested me and was in the car talking

15   on the phone, there was a conversation between

16   the dispatcher and him in which the dispatcher

17   indicated that he thought the guy who was

18   named Ron gave a fake name.  That he neglected

19   to specifically raise that when talking to

20   Officer Bean, that this was not an identified

21   source, was a negligent action that he should

22   have informed the officer of.  Those are the

23   specific actions that I believe the dispatcher

1    erred in.

2   Q.   And my response to that is, so what? I mean,

3    the dispatcher -- you don't have any doubt

4    that the dispatcher received a call of a

5    suspicious person, true?

6   A.   Actually, the word "suspicious" was introduced

7    by the dispatcher. The original word by the

8    caller was "mysterious".

9   Q.   And is it your opinion that the dispatcher

10    should not have transmitted that information

11    to Officer Bean, just shouldn't have sent him

12    out there at all?

13   A.   Well, the issue was -- I don't object to the

14    dispatcher sending him. I object to the fact

15    that he should have sent him with the

16    indication that you do not have a

17    reasonable -- the information he needed to

18    provide prevented reasonable suspicion and the

19    error of the word "houses".

20   Q.   Mr. McLaurine, the dispatcher doesn't know --

21    all he knows is somebody has called in, and

22    that's why they send a police officer out

23    there, to check it out, isn't it, to see what

154

1        the facts are, true?

2    A.   True.

3    Q.   And you weren't arrested for looking at

4        houses, and you weren't arrested because this

5        person referred to you as -- to somebody as

6        mysterious.  You were arrested because you

7        didn't comply with an order.

8    A.   That was part of the reason given in my

9        original arrest in the police report, and the

10       statement signed before the magistrate okaying

11       the warrant indicated that Officer Bean wrote

12       in his police report that there was a call,

13       and that call involved somebody looking into

14       houses as opposed to at them and that the

15       person was carrying something and possibly a

16       weapon.

17   Q.   And so what do you say?  The dispatcher should

18       not have sent the information?

19   A.   No.  The dispatcher should have been clear

20       about the fact that this was someone who was

21       using a fake name and an unreliable source.

22   Q.   And do you think that would have changed

23       whether or not you would have given your name

1   and address?  You're under oath.

2   A.   I know.  And I have to consider --

3   Q.   Because you didn't know about the dispatch

4        call.

5   A.   I know.  But what I did know was that the

6        reasons that the officer gave me were

7        insufficient for me to even have to consider

8        it.

9   Q.   My question is real simple.  If the dispatcher

10       had sent it exactly like it was, are you

11       testifying that you would have given your name

12       and address when asked by Officer Bean?

13  A.   Exactly like it was?

14  Q.   Yeah.

15  A.   No.

16  Q.   Now, what about Lieutenant Will Matthews and

17       Lavarro Bean?  Why is Bean sued?

18  A.   He unreasonably stopped me.  He arrested me

19       without legal grounds, and he's being sued for

20       racial discrimination of intimidation while in

21       custody.

22  Q.   And you've told me about those?

23  A.   Right.

1   Q.   Lieutenant Will Matthews, what is he sued for?

2   A.   He was there during the first racial comment.

3        He was the supervisor in charge of Officer

4        Bean.  He was present.  He heard it.  He was

5        close enough to hear it.  And the three

6        questions did not come in rapid fire.  They

7        came with a pause between each question.  And

8        the fact that he did not stop the

9        investigation when this racial discrimination

10       was going on, he was negligent in his duty to

11       supervise.

12  Q.   Let me tell you so you and I can be clear with

13       each other.  I'm naming these people because I

14       want to know everything that you think they've

15       done wrong.  So I want you to be complete.

16       I'm not suggesting you weren't complete.  I

17       just want to be sure I have everything when we

18       finish as to what --

19            Have we now covered every reason that

20       you've sued Officer Bean?

21  A.   The other issue is I know that Officer

22       Matthews was involved in the physical arrest

23       as well, and that -- I believe that covers --

1  Q.  That covers then Sergeant, now Lieutenant,

2     Matthews?

3  A.  Yes.

4  Q.  And how about Lieutenant Howell?  What is it

5     that Lieutenant Howell did wrong that's caused

6     you to sue him?

7  A.  He apparently was the one who made the

8     decision to arrest me and cuff me and take me

9     on because they said they were waiting on him

10    to get there.

11 Q.  Is that everything?

12 A.  I believe with Lieutenant Howell, yes.

13 Q.  Now, Chief of Police Frank Degraffenried, why

14    have you sued him?  What do you say he's done

15    wrong?

16 A.  I have spoken directly with Chief

17    Degraffenried about this issue, that the

18    grounds and reasons that he gave for my stop

19    in January and my arrest that night of a high

20    crime area being the reason -- a definition of

21    reasonable suspicion under the Alabama

22    statutes is not adequate and that he has the

23    responsibility of making sure that the

1    officers under his command obey the law.  He

2    trains them to follow the correct

3    interpretation of the law, and he's failed in

4    that duty.

5    Q.    Paraphrasing, are you saying that you don't

6          think Chief of Police Degraffenried properly

7          trained and supervised Howell, Matthews and

8          Bean?

9    A.    All the officers under his command.  He has

10         given his assent to high crime area as being a

11         legitimate reason to stop someone.

12   Q.    And you don't know what training the police

13         officers go through?

14   A.    APOST.  I'm familiar with the APOST

15         certification.  And other than the internal

16         training they get, I'm not directly familiar

17         with it.

18   Q.    Do you know what hands-on training Chief

19         Degraffenried is actually responsible for?

20   A.    No, I do not.

21   Q.    Have we covered anything about Chief

22         Degraffenried?

23   A.    There is one other issue.  After the

1    conviction in the municipal trial, my

2    associate, Miguel Stark, had spoken with Chief

3    Degraffenried.  And according to Miguel Stark,

4    Chief Degraffenried indicated that part of the

5    reason that this prosecution was going forward

6    was because of Joe Bailey's association with

7    Bobby Lowder.  Well, he didn't say Bobby

8    Lowder.  Let me retract that.  He said -- What

9    Miguel Stark said was his association with

10   Bobby Lowder.  I think the specific phrase he

11   attributed to Police Chief Degraffenried was,

12   what's going on with Colonial Bank.  And in

13   this particular discussion, it was referring

14   to illegal activity involved with Colonial

15   Bank and Joe Bailey's position as a magistrate

16   in the City of Auburn to hear cases on those

17   subjects.

18          The question I have -- and I don't

19   understand yet, and it's one of the things I

20   would like to know -- is whether such an

21   action was intended to basically be an

22   intimidation of you're messing with the Mafia

23   or whether it was an actual, legitimate

1    concern on my behalf to make you understand

2    that you are dealing with the Mafia.  And that

3    is an issue I think has to be resolved and is

4    part of the interrogatories I intend to

5    produce.

6  Q.  You're going to have to go back and start

7    slowly on that one.  Start over.  Miguel Stark

8    told you what?

9  A.  He indicated that Frank Degraffenried, in a

10   discussion between -- Frank Degraffenried and

11   Miguel Stark were talking about why I was

12   being prosecuted and that it had to do with

13   what's going on with Colonial Bank.  And the

14   implication of what that phrase meant was

15   there was illegal activity going on and that

16   somehow the judge and Bobby Lowder, who is a

17   chief -- I don't know what his exact position

18   is, but he's an executive apparently with

19   Colonial Bank -- their relationship had to do

20   with that particular issue.

21       I do not know the legitimacy or accuracy

22   of those claims.  All I know is that it was a

23   communication about the subject.

161

1   Q.   Miguel Stark told you that he and the chief of

2        police had discussed why you were being

3        prosecuted?

4   A.   Yes.  Why the prosecution was being handled

5        with such, I guess, emphasis and why it was

6        being allowed to go through as it was.

7   Q.   And that the chief of police told Miguel Stark

8        that it had to do with what was going on with

9        Colonial Bank?

10  A.   Yes.

11  Q.   What's your connection with Colonial Bank?

12  A.   Not my connection with Colonial Bank but the

13       connection of any suit against the City.  Any

14       indication or action by the City is actively

15       prohibited to prohibit investigation into the

16       City that may result in an association to be

17       found between Judge Bailey and Colonial Bank.

18  Q.   So this prosecution went forward according to

19       Miguel Stark to cover up a relationship

20       between Judge Bailey and Bobby Lowder?

21  A.   That was what was communicated to me.

22  Q.   Why?  I mean, I don't -- you're missing me --

23       I'm missing -- What's your connection with

162

1     Colonial Bank, Judge Bailey and Bobby Lowder

2     that anybody would care about your --

3   A.   It's not so much me.  It is the fact that the

4     City actively discourages civil suits.  It's a

5     mechanism to prevent the very thing we're in

6     right now, which is a lawsuit, to discuss

7     these issues.

8         A specific other example of which I'm

9     aware of is involving Hosea Korea (phonetic),

10    who is an individual who had a case before

11    Judge Bailey involving -- I don't know the

12    man's name, but he runs Tiger Taxi.  And

13    Mr. Korea runs Twin City Taxi, and there was

14    an altercation -- I'm not clear on the

15    exactness -- between them.  But one of the

16    specific things Judge Bailey seemed to

17    communicate to him, at least through his

18    attorney, was that part of his conditions for

19    allowing, I guess, a hold time on criminal

20    prosecution or complaints against the two

21    individuals would be that there be no civil

22    action.  And I consider that to be an

23    extrajudicial action on the part of Judge

1      Bailey.  This particular type of thing, that

2      suits not be pressed in this area, is the

3      general thing that I'm going after, that I'm

4      trying to raise or point out here.

5  Q.  What illegal activity is going on between

6      Judge Bailey and Bobby Lowder and Colonial

7      Bank?  What do Colonial Bank and Bobby Lowder

8      have to do with the City of Auburn?

9  A.  The general structure on this is that the --

10     at this time I have no specific or credible

11     information about what Mr. Lowder -- Well, I

12     can't say that.  The allegation is that

13     Mr. Lowder is a prominent individual in the

14     community and that he is protected through

15     influence within the community.  The direct

16     connection to me is through Judge Denson.

17     Judge Denson has been reported -- It's been

18     reported in the newspaper that Bobby Lowder at

19     one point made a threat against Judge Denson's

20     life, and that was part of the reason to

21     disqualify Judge Denson from hearing a case

22     involving the Auburn University trustees.

23        The connection here is that it is part of

1      a larger issue concerning the resistance of

2      the City to any type of lawsuit that might

3      uncover activities that it is participating in

4      that are not legal.  And I have some more

5      examples of those if you would like me to

6      raise them.

7  Q.  Well, let me just ask you this.  I don't

8      understand how prosecuting you has anything to

9      do with uncovering any kind of relationship.

10     You've talked about the Mafia.  Is there

11     somebody supposed to be the Mafia?

12  A.  Those allegations have been made by multiple

13     individuals to me.

14  Q.  That you're being prosecuted because of the

15     Mafia?

16  A.  Because the individuals involved are related

17     to illegal activities which would be organized

18     crime and that a civil suit involving them --

19     involving specific individuals might lead to

20     the discovery of their connection to organized

21     crime.

22  Q.  What illegal activity is Judge Bailey involved

23     in?

1    A.    The specific one where the judge decided that

2         it should not be heard in his courtroom. This

3         is an issue that was raised -- There are two.

4         The first one is that one. He refused to

5         allow a discussion of topic because it might

6         involve a civil case, which I believe is

7         prohibited by the Alabama Bill of Rights.

8    Q.    Talking about your case?

9    A.    Yes. In my case where he basically performed

10        an illegal act by saying that you can't talk

11        about a civil case in this matter.

12           The other issue is the allegation has come

13        to me through Miguel Stark allegedly from

14        Chief of Police Degraffenried that there is

15        illegal activity going on with Colonial Bank

16        and that Judge Bailey has an association with

17        Bobby Lowder.

18    Q.    I guess I still don't understand where you

19        make the leap that somehow your prosecution

20        has anything to do with Colonial Bank and

21        Bobby Lowder. Explain that to me one more

22        time.

23    A.    I believe that it is a standard of practice

1    employed by Judge Bailey and by the

2    individuals under his authority in the

3    judicial department of the City of Auburn to

4    discourage civil lawsuits of any type and, in

5    particular, lawsuits against the City in an

6    illegal manner.

7  Q.  Okay.  What's that got to do with Colonial

8    Bank and Judge Bailey's relationship with

9    Bobby Lowder and you?

10  A.  The fact that I'm having a case -- This

11    allegation is not coming from me.  This

12    allegation is my interpretation of what was

13    communicated to me by Mr. Stark in his

14    communications with Chief Degraffenried.  You

15    probably need to ask him about the specifics

16    of it because I intend to.

17  Q.  And who is Hosea Korea?  Have you talked to

18    him?

19  A.  He's the owner of Twin City Taxi, and I speak

20    with him on a regular basis because I use his

21    service, and Tiger Taxi.

22  Q.  Has he told you about any illegal activities?

23  A.  He has told me about an activity that I

167

1     believe to be illegal in which the judge

2     indicated that he did not want any civil

3     action to be pursued in order to allow a

4     cooling off period for the complaints that

5     he and -- the cross-complaints that he -- I

6     think it's cross-complaints -- that he and the

7     owner of Tiger Taxi have that any action by

8     the judge indicating that he does not want to

9     see a civil case proceed is a violation of the

10    Alabama Constitution.

11  Q.  Have we covered everything with Degraffenried?

12  A.  I believe so.

13  Q.  What about David Watkins?  What is it that

14     David Watkins has done wrong in your opinion?

15  A.  He was the city manager.  He was responsible

16     for the executive authority and for the same

17     grounds that Chief Degraffenried is

18     responsible.

19  Q.  In training and supervision?

20  A.  Training and supervision.

21  Q.  You're not lumping him in there with the Mafia

22     and Colonial Bank or anything, are you?

23  A.  No.

168

1   Q.   Have we covered everything on David Watkins?

2   A.   I believe so, because he was not -- yeah.

3   Q.   Bill James, what is it you think he's done

4        wrong?

5   A.   He's the public safety director and the

6        supervisor of the chief of police and for the

7        same reasons that Chief of Police

8        Degraffenried for supervising and training is

9        responsible but not for the other allegations.

10  Q.   Is that everything on Mr. James?

11  A.   Yes.

12  Q.   Chris Duggan, what is it he did wrong?

13  A.   Charles Duggan?

14  Q.   Charles.  I'm sorry.

15  A.   Mr. Duggan for the same reason as the chief of

16       police.  But in addition to that, I had the

17       opportunity to speak to Mr. Duggan on this

18       matter, and his response to the unreasonable

19       search and seizures was, let's see what the

20       judge says.  He was specifically and quite

21       specifically made aware of this issue and, as

22       a result, made a decision to continue with

23       this action.

169

1   Q.   So he's a supervisor?  Your complaint against
2        him is as a supervisor?
3   A.   Yes.
4   Q.   And that's based on his response to you that
5        let's see what the judge or the jury says?
6   A.   Yes.
7   Q.   And, in fact, the judge or the -- the jury
8        found that there was no -- that there was
9        reasonable suspicion and found you guilty,
10       didn't they?
11  A.   Yes.  And that is on appeal.
12  Q.   Whether it's on appeal or not, what Mr. Duggan
13       said is let's see what happens in court
14       basically.  And what happened in court was you
15       got convicted.
16  A.   Yes.
17  Q.   That would make somebody of a reasonable mind
18       think, hey, maybe we're not doing anything
19       wrong.  Would you agree with that?
20  A.   If the conviction was valid, yes.
21  Q.   Now, you have what you have filed and I have
22       opposed as an extended complaint.  Do you
23       recall that?

# EXHIBIT "C"

# AFFIDAVIT OF FRANK DEGRAFFENRIED IV

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

WILLIAM S. MCLAURINE, II,                  *
                                           *
        Plaintiff,                         *
                                           *
vs.                                        *        CIVIL ACTION NO.: 3:06-cv-1014-MEF
                                           *
the CITY OF AUBURN, ALABAMA, et al.,       *
                                           *
        Defendants.                        *


### AFFIDAVIT OF FRANK DEGRAFFENRIED IV

Before me, the undersigned authority in and for said county and state personally appeared Frank M. deGraffenried, IV who being known to me and being first duly sworn, deposes and says under oath as follows:

1.      My name is Frank M. deGraffenried, IV.  I am an adult over the age of nineteen and I have personal knowledge of the following matter.

2.      I am the Chief of Police in the City of Auburn.  The City has consistently provided policy guidance and training to its law enforcement officers regarding legal issues in law enforcement, search and seizure, citizen contacts, and the laws of arrest. Training in these areas is provided at the basic police academy level, in a formal Field Training Officer Program, and in further in-service training programs.   There is a training supervisor and I am ultimately responsible for all training of law enforcement officers.

3.      Our law enforcement officers are provided training on field interviewing individuals when the officer has a reasonable suspicion that criminal activity has been or is about to be committed.  The officers are trained that justification for conducting such an interview can include but not be limited to (1) a persons demeanor, (2) the time of day or night is inappropriate for a suspect's presence in a certain area, (3) the person's presence in that area

1

is suspicious, (4) the person is carrying a suspicious object, (5) the person's wearing clothing that suggests he is carrying a weapon, (6) the person is located at the time and place of an alleged crime, or (7) the officer has knowledge of the person's criminal record or involvement in criminal activity.

4.    The City does not have a practice, policy or procedure of exercising racial discrimination in the course of questioning individuals, making arrests or otherwise fulfilling the duties of a law enforcement officer. Officers are instructed and trained to avoid treating persons differently based on any protected differences. I have not received complaints that Officer Bean or any other officer of the Police Division has treated white citizens unequally or unfairly until McLaurine pursued this claim.

5.    It is my understanding that McLaurine has named several employees of the City of Auburn in his lawsuit. For the record, I have included the job titles of those individuals. The Public Safety Director is Bill James. Each division head with Public Safety is a deputy director and James is their immediate supervisor. The Public Safety Deputy Director of the Communications Division is Benjie Walker. The prior City Manager was David Watkins. As of February 2006, Charles Duggan became the acting City Manager and was appointed to the position officially on October 17, 2006.

6.    In January 2004, I received notice through one of my supervisors that McLaurine was complaining about being stopped while he was walking in the early morning hours. He was questioned over an approximate 3 minute period and released. McLaurine requested a written response to his complaint, so I wrote back after looking into the matter and explained that I agreed with the officer's decision to stop McLaurine. I explained the time line of criminal events that transpired before he was stopped on the night in question in the same area. I explained the importance of the police officers to deter criminal activity, especially when school was out and crime activity rose. I also had a conversation with McLaurine about the January incident

2

wherein he told me that he disagreed that he should have been stopped. He told me he was going to research the matter and I invited him to get back in touch with me if he wished, and that I would be interested in his findings. I did not hear from him again until he complained of the present incident.

7.    Based on my review and understanding of the facts regarding Mr. McLaurine's arrest in November 2004, the officers in question followed procedure when executing their job responsibilities that evening in questioning Mr. McLaurine and arresting him.

Dated this the 30th of April 2007.

_Frank M. deGraffenried, IV_
Frank M. deGraffenried, IV

STATE OF ALABAMA        )

COUNTY OF LEE            )

Before me the undersigned Notary Public in and for State and County aforesaid, personally appeared Frank M. deGraffenried, IV, Chief of Police of City of Auburn who is personally known to me and who, being by me first duly sworn, doth depose and say that he signed the above affidavit to the best of his knowledge, information and belief and with full understanding of its effect.

_Duncan W. Cooper_
NOTARY PUBLIC

(SEAL)                    My Commission Expires: _October 31, 2007_

3

# EXHIBIT "D"

# AFFIDAVIT OF
# BENJIE WALKER

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

WILLIAM S. MCLAURINE, II,     *
     *
    Plaintiff,     *
     *
vs.     *    CIVIL ACTION NO.: 3:06-cv-1014-MEF
     *
the CITY OF AUBURN, ALABAMA, et al.,  *
     *
    Defendants.     *

### AFFIDAVIT OF BENJIE WALKER

Before me, the undersigned authority in and for said county and state personally appeared Benjie Walker who being known to me and being first duly sworn, deposes and says under oath as follows:

1.    My name is Benjie Walker.  I am an adult over the age of nineteen and I have personal knowledge of the following matter.

2.    I am the Deputy Director of Public Safety - Communications Division — City of Auburn Alabama.

3.    As the Communications Division Head, I develop all systems and training for the dispatchers and oversee the implementation of same.

4.    Pursuant to that training, if a dispatcher receives a call regarding a suspicious person or irregular activity, he/she would dispatch that call to an officer with the information provided so that appropriate action could be taken immediately.  Said policy is critical to minimize criminal activity.

1

5.    I am aware of the incident involving William McLaurine in November 2004.

Procedures were followed regarding the call that was dispatched to Officer Bean about

McLaurine.

Dated this the _30th_ of April 2007.

_Benjie Walker_
Benjie Walker

STATE OF ALABAMA    )

COUNTY OF LEE    )

Before me the undersigned Notary Public in and for State and County aforesaid, personally appeared Benji Walker who is personally known to me and who, being by me first duly sworn, doth depose and say that he signed the above affidavit to the best of his knowledge, information and belief and with full understanding of its effect.

_Candace C. Anenton_
NOTARY PUBLIC

(SEAL)                My Commission Expires:_____

My Commission Expires August 15, 2007

2

# EXHIBIT "E"

# COURT OF CRIMINAL
# APPEALS OPINION

2 2 7 0 7

Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals

State of Alabama
Judicial Building, 300 Dexter Avenue
P. O. Box 301555
Montgomery, AL 36130-1555

RELEASED

FEB 2 3 2007

CLERK
ALA COURT CRIMINAL APPEALS

PAMELA W. BASCHAB
Presiding Judge
H.W. "BUCKY" McMILLAN
GREG SHAW
A. KELLI WISE
SAMUEL HENRY WELCH
Judges

Received

FEB 2 7 2007

Human Resources

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

## MEMORANDUM

CR-05-1600                    Lee Circuit Court CC-05-1600

### William S. McLaurine v. City of Auburn

SHAW, Judge.

The appellant, William S. McLaurine, was convicted of obstructing governmental operations, a violation of § 13A-10-2, Ala. Code 1975, as adopted by the City of Auburn in Ordinance No. 1130 and codified in § 13-1 of the Auburn city code. He was sentenced to three months in the county jail; the sentence was suspended, and he was placed on unsupervised probation for one year and fined $500.00.[1]

---

[1] McLaurine was originally convicted in Auburn municipal court. He appealed to the circuit court for a de novo jury trial.

The evidence adduced at trial indicated the following. In the early morning hours of November 27, 2004, Auburn police officer Lavaro Bean, received a radio dispatch regarding a suspicious man that had been seen walking in the area of North College Street and Glenn Avenue in Auburn. The man was described as wearing dark pants and a gray shirt or jacket. Officer Bean responded to that general location, where he found McLaurine, who matched the description that he had been given and who was the only person outside in that area, walking very slowly on the sidewalk, with his hands in his jacket, and looking at houses and apartments normally occupied by students at Auburn University. Officer Bean testified that the houses and apartments in that neighborhood were largely empty on the morning in question because of the Thanksgiving holiday break. He also testified that for that reason, and because a burglary had been reported in that area either that night or the night before, the police department was being especially vigilant in paroling that neighborhood.

Officer Bean testified that he asked McLaurine to stop, but that McLaurine kept walking. Officer Bean asked McLaurine a second time to stop and McLaurine complied. Officer Bean asked McLaurine why he was walking in that neighborhood, to which McLaurine responded, "Officer, I don't have to answer those questions."     (R. 304.)     Officer Bean then asked McLaurine if he had any weapons on him and he told McLaurine that he could be on his way if he would just show some identification.     McLaurine again refused to answer and thereafter repeatedly refused to provide Officer Bean with any identifying information. Officer Bean testified that he asked McLaurine at least 24 times to provide his name, address and/or his destination and that McLaurine refused each time. Officer Bean explained to McLaurine that he heeded the identifying information because crime generally went up in that neighborhood during the holiday season and because the police were still investigating a mysterious death that had occurred in the area. After explaining to McLaurine that he did not want to arrest him, Officer Bean called his shift supervisor, Lieutenant Will Matthews, for assistance.[2]     Lt. Matthews testified that he responded to the scene and tried repeatedly, but unsuccessfully, to get McLaurine to provide

---

[2]Lt. Matthews was a sergeant at the time of the incident.

2

some identifying information. At one point after Lt. Matthews arrived on the scene, McLaurine stated that he was going to leave unless he was physically detained by the officers. Lt. Matthews testified that he placed his left hand on McLaurine's right arm and informed him that he was being physically detained.

Ultimately, Lt. Matthews requested assistance from Lieutenant Keith Howell, the shift commander and the highest ranking officer on duty that evening. Lt. Howell testified that he responded to the scene and asked McLaurine if he was familiar with the law requiring a person to provide identifying information to the police upon request. According to Lt. Howell, McLaurine responded that he was familiar with the law, but that he disagreed with it. McLaurine was eventually arrested for obstructing governmental operations and transported to the county jail. Once at the jail McLaurine provided his name and other identifying information and for the first time told the officers that he had been walking to a Subway restaurant when he was approached by Officer Bean.

McLaurine, who represented himself at trial, testified in his own defense. He stated that he had refused to cooperate with the officers because he did not think that they had the authority to ask him to stop and identify himself or to ask him where he was going. He admitted that he had threatened to leave the scene unless he was physically detained and that he had taken a step away from the officers. McLaurine also stated that he had filed a notice of claim with the City of Auburn, demanding $250,000,000.00 in damages for what he claimed was an illegal detention by the police.

McLaurine's first argument on appeal, as we understand it, is that the trial court erred in denying his motion to suppress the City's evidence and, thus, his motion for a judgment of acquittal because, he says, the police had no reasonable suspicion to believe that he may have been involved in criminal activity so as to justify detaining him for further investigation. He argues that he was illegally detained and, therefore, that he could not have interfered with or hindered what he says was an illegal governmental activity on the part of the police. The City argues that, based on the totality of the circumstances, Officer Bean had

3

reasonable grounds to suspect that McLaurine may have been involved in criminal activity.

Section 13A-10-2, Ala. Code 1975, provides in pertinent part:

> "(a) A person commits the crime of obstructing governmental operations if, by means of intimidation, physical force or interference or by any other independently unlawful act, he:
>
> > "(1) Intentionally obstructs, impairs or hinders the administration of law or other governmental function; or
> >
> > "(2) Intentionally prevents a public servant from performing a governmental function."

Alabama's "stop and identify" statute, § 15-5-30, Ala. Code 1975, states:

> "A sheriff or other officer acting as sheriff, his deputy or any constable, acting within their respective counties, any marshal, deputy marshal or policeman of any incorporated city or town within the limits of the county or any highway patrolman or state trooper may stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense and may demand of him his name, address and an explanation of his actions."

The evidence indicated that McLaurine was detained because he was walking in the early morning hours in what was essentially a neighborhood that had been temporarily abandoned for the holidays by its usual student inhabitants. Officer Bean observed McLaurine walking very slowly and looking in the direction of the houses and apartments. The evidence also indicated that a burglary had been reported in that immediate vicinity either that night or the night before and that the police were still investigating an unexplained death in the area. We agree with the trial court and the City that Officer Bean was able to articulate specific facts and inferences that

4

gave him reasonable suspicion that McLaurine may have been involved in criminal activity. The evidence indicates that Officer Bean was justified in stopping McLaurine in order to obtain identifying information and to satisfy himself that criminal activity was not afoot. In Richardson v. City of Trussville, 492 So. 2d 625 (Ala. Crim. App. 1985), this Court addressed a similar issue, stating:

> "The evidence shows that Richardson was stopped because he was in the parking lot of a dentist's office that had been previously burglarized. The trial judge found that the stopping was justified and merely constituted 'good law enforcement.' We agree because a police officer does not need probable cause to stop a person for questioning; he need only be able to articulate specific facts and inferences that lead to a reasonable suspicion of criminal activity.

> "In Brooks v. State, 460 So. 2d 242 (Ala. Cr. App. 1984), a State Capitol police officer observed unusual activity in a State building parking lot. That reason, coupled with the fact that there had recently been a rash of break-ins involving cars at the State complex, prompted further investigation. In Brooks, we held that a police officer may stop an individual to make an investigation even though probable cause does not exist for an arrest. 460 So. 2d at 243. See also Spradley v. State, 414 So. 2d 170, 173 (Ala. Cr. App. 1982), and Minnifield v. State, 390 So. 2d 1146, 1151 (Ala. Cr. App.), cert. denied, 390 So. 2d 1154 (Ala. 1980).

> "The United States Supreme Court answered a similar issue in Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed. 2d 889 (1968), when it recognized that,

> > "'a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.'

5

"<u>Terry</u> went on to hold that a stop is permissible 'where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot.' <u>Terry</u>, 392 U.S. at 30, 88 S.Ct. at 1884, 20 L.Ed. 2d 889.

"Moreover, the Alabama Legislature enacted specific legislation dealing with the powers of law enforcement officers to investigate suspected criminal activity. Section 15-5-30, Code of Alabama 1975, reads:

"'A sheriff or other officer acting as sheriff, his deputy or any constable, acting within their respective counties, any marshal, deputy marshal or policeman of any incorporated city or town within the limits of the county or any highway patrolman or state trooper may stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense and may demand of him his name, address and an explanation of his actions.'

"Given the late hour Richardson's car was observed in the dentist's office parking lot and the fact that both police officers had been called to burglaries at that particular office in recent months preceding the date in question, we believe that reasonable grounds existed for the officers to suspect that the individual in the automobile might be involved in criminal activity and that further investigation was warranted.

"'A policeman who lacks the precise level of information necessary for probable cause to arrest is not required simply to shrug his shoulders and allow a crime to occur or a criminal to escape, and a brief stop of a suspicious individual, in order to determine his identity or to maintain the

6

> status quo momentarily while obtaining more
> information, may be most reasonable in
> light of the facts known to the officer at
> the time.' 6A C.J.S. Arrest § 38 (1975)."

492 So. 2d at 627-28.

Just as in Richardson, the action of Officer Bean and his
fellow officers in the present case was a reasonable effort on
their part to maintain the status quo momentarily while
obtaining more information. This action was authorized by
§ 15-5-30. McLaurine's subsequent refusal to identify himself
gave the officers probable cause to arrest him for obstructing
governmental operations. See, e.g., Hiibel v. Sixth Judicial
District Court of Nevada, Humboldt County, 542 U.S. 177
(2004). Therefore, the trial court did not err in denying
McLaurine's motion to suppress the evidence and the case was
properly submitted to the jury.

McLaurine also contends that § 15-5-30 is
unconstitutionally vague. The exact basis for this contention
is not clear. However, we can find no indication in the
record that the trial court was ever asked to rule on a
specific constitutional challenge to § 15-5-30. The record
does contain a document filed by McLaurine entitled "Notice of
Defense," which states:

> "This is formal notice of the some of DEFENSES [sic]
> raised by the defendant. This notice is not
> intended to exclude any defense from consideration
> at this time or any future time. The following
> defenses should be considered:

> "The law or laws used to prosecute the defendant are
> unconstitutional on some and/or all of the following
> grounds: Violation of the Fourth Amendment to the
> Constitution of the United States, and all of its
> provisions; Violation of the Fifth Amendment to the
> Constitution of United States, and all of its
> provisions; the law(s) being used to prosecute the
> defendant are VOID FOR VAGUENESS; Violation of some
> an/or all VESTED RIGHTS under the constitutions,
> statutory, and/or common law of the United States
> and/or the State of Alabama that allow citizens to

7

refuse to respond to police during questioning
and/or protect citizens from unlawful seizure.

"The DEFENSES raised in this NOTICE should be
considered to apply in all proceedings and
considerations in this matter, including, but not
limited, the burden of proof requirements placed on
the prosecution for probable cause and/or reasonable
suspicion."

(R. 150.)  It does not appear, however, that this document
required or prompted any specific response or ruling by the
trial court.  The only other reference to a constitutional
challenge to § 15-5-30 appears in McLaurine's closing argument
to the jury, where he argued that the statute was
unconstitutional.  "Review on appeal is limited to review of
questions properly and timely raised at trial."  Newsome v.
State, 570 So. 2d 703, 716 (Ala. Crim. App. 1989).

Furthermore, we note that even if this issue had been
properly raised below, this Court would not review it because
McLaurine's brief does not comply with Rule 28(a)(10),
Ala.R.Crim.P.   Rule 28 requires more than cursory,
undelineated, and vague propositions accompanied by citations
to cases with no argument as to how those cases support the
appellant's contentions. See, e.g., Spradlin v Spradlin, 601
So. 2d 76, 78-79 (Ala. 1992); see also L.J.K. v. State, 942
So. 2d 854 (Ala. Crim. App. 2005).

For the foregoing reasons, the judgment of the trial
court is affirmed.

Affirmed by memorandum.

McMillan, Wise, and Welch, JJ., concur.  Baschab, P.J.
concurs in the result.

MALICIOUS PROSECUTION                    APJI CIVIL 24.02

## APJI 24.02

### CRIMINAL CASE—ELEMENTS OF PROOF

The material averments of the plaintiff's complaint which are in issue are:

(1) A criminal judicial proceeding instituted by the defendant(s) against the plaintiff.

(2) That the judicial proceedings were instigated by the defendant(s) maliciously.

(3) That the judicial proceedings were instigated without probable cause.

(4) That the judicial proceedings have been terminated in favor of the plaintiff.

(5) That the plaintiff suffered damage as a proximate consequence of the prosecution thereof.

---

### Notes on Use

If any of the above elements are not disputed use only those in issue.

### References

Delchamps, Inc. v Larry, 613 So 2d 1235 (1992, Ala).

Boothby Realty Co. v Haygood, 269 Ala 549, 114 So 2d 555 (1959).

Birwood Paper Co. v Damsky, 285 Ala 127, 229 So 2d 514 (1969).

Johnston v Duke, 284 Ala 359, 224 So 2d 906 (1969).

52 Am Jur 2d, Malicious Prosecution §§ 128-190.

Admissibility and permissible use, in malicious prosecution action, of documentary evidence showing that prior criminal

651

**APJI CIVIL 24.02**     **MALICIOUS PROSECUTION**

proceedings against instant plaintiff were terminated in his favor.
57 ALR2d 1086.

Discharge in habeas corpus proceedings as constituting favorable
termination of criminal proceedings requisite to maintenance of
malicious prosecution action. 30 ALR2d 1128.

652