**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **WILLIAM S. MCLAURINE, II,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **vs.** | * | **CIVIL ACTION NO.: 3:06-cv-1014-MEF** |
| | * | |
| **the CITY OF AUBURN, ALABAMA, et al.,** | * | |
| | * | |
| **Defendants.** | * | |

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT ON BEHALF OF DEFENDANT**

COME NOW the Defendants in the above-styled cause and submit the following

memorandum brief and evidentiary materials in support of their motion for summary judgment.

**I.**
**SUMMARY OF PLAINTIFF'S ALLEGATIONS AND THE
DEFENDANTS' AFFIRMATIVE DEFENSES**

This is a §1983 action arising out of the arrest and subsequent conviction of Plaintiff William

S. McLaurine, II (hereinafter "McLaurine") by the City of Auburn Police Department.[1]  In his

Amended Complaint filed November 27, 2006, McLaurine alleges that he was the subject of an

inappropriate dispatch call by the City of Auburn, then wrongfully arrested by Officer Lavarro Bean,

Lieutenant William Mathews, and Lieutenant Keith Howell[2] in Auburn, Alabama on or about

November 26, 2004.  McLaurine also brought said lawsuit against the Chief of Police Frank

deGraffenried, City Manager at the time David Watkins, Director of Public Safety Bill James,

Deputy Director of Public Safety Benjamin Walker, and the present City Manager Charles Duggan

---

[1] Defendants contend that McLaurine fails to properly plead a §1983 claim.  Insomuch as the court has referred to the claims has having been brought pursuant to §1983, Defendants will address same.

[2] At the time of the incident in question, Lt. Mathews was a Sergeant but he is called by his present title throughout this brief.

based on training and supervision claims.  McLaurine also claims race discrimination based on questions asked of him by Officer Bean during the incident.

The Defendants filed a Motion to Dismiss on behalf of several of the Defendants and an Answer on behalf of all Defendants.  The answer asserted among other defenses that the City could not be held liable based on a theory of *respondeat superior*, the Defendants were entitled to immunity, Plaintiff did not allege conduct which rises to the level of a constitutional violation, and that Plaintiff could not sustain a claim for false arrest under the circumstances.

The Motion to Dismiss was denied and Plaintiff's response to that motion was allowed as an amendment to Count III, alleging that officer Bean's conduct was consistent with the policies and practices of the City.[3]

Plaintiff filed a first "Motion for Corrective Action" on January 23, 2007 asking for names of the dispatcher, location information for service as to one of the Defendants and clarity of Defendants' Answer.

Plaintiff filed a second "Motion for Corrective Action" on January 26, 2007.  The Court granted that motion to the extent that is sought to clarify that damages were being sought against Benji Walker insomuch as he allegedly had responsibility for supervising and training the unnamed dispatcher during the incident in question as part of Count II in the Complaint.

On February 26, 2006, Plaintiff made a motion to amend the Complaint to add numerous individuals, all of whom played some part in his municipal court conviction and his jury trial conviction in circuit court.  The Defendants objected to this requested amendment of the Complaint on March 14, 2007, providing the precedential case authority as to why said amendment should not be allowed.  The Court never granted Plaintiff's motion to amend and therefore, the individuals named in the attempted amendment have not been served and are not parties to this cause of

---

[3] See Court's February 26, 2007 Order.

action. On March 10, 2006, Plaintiff filed a motion to amend the Complaint to add the names of two individuals as the "unnamed dispatcher." Pursuant to the Court's Order, Defendants timely objected to the Plaintiff's motion to add these parties. The Court never granted Plaintiff's motion to add the parties and therefore, said individuals have not been served and are not parties to this lawsuit. To this end, Defendants reserve the right to file dispositive motions as to any of the subject individuals should the Court ever allows the amendments. However, Defendants adopt and incorporate herein the objections filed to said amendments and assert that all the subject individuals are protected by immunities for their alleged actions. Defendants further allege that it is impossible for McLaurine to establish an underlying constitutional violation or state law claim based on his conviction or the individuals involved therein inasmuch as it that conviction was affirmed by the Alabama Court of Criminal Appeals. These arguments are preserved and Defendants reserve the right to more fully address if and when the additional individuals are ever made parties.

The Defendants filed an amended Answer denying all allegations and asserting that all claims were due to be dismissed based on the doctrines of immunity and other affirmative defenses.

## II.
## SUMMARY OF UNDISPUTED FACTS[4]

### A.   BACKGROUND FACTS

Officer Lavarro Bean is a law enforcement officer for the City of Auburn. (See Exhibit "A" Trial Transcript p. 297 at lines 14-24). William Mathews is a Lieutenant with the City of Auburn

---

[4] For purposes of clarity this statement of material and undisputed facts includes factual allegations of Garner, which may not be relevant or actual facts. Rather, this is a statement of "facts" for purposes of summary judgment. See Cox v. Administrator, U.S. Steel and Carnagie Pension Fund, 17 F.3d. 1386,1400 (11th Cir. 1994). This statement may also contain statements of the absence of critical needed facts, for purposes of clarifying the issues.

Police Department. (Trial Transcript p. 330 at lines 14-21). Keith Howell is a Lieutenant Shift Commander with the City of Auburn Police Department. (Trial Transcript p. 346 at lines 4-19).

Plaintiff William S. McLaurine, II is a 35 year old white male who resided in the Auburn, Alabama area at the time in question. (See Exhibit "B" Deposition of William S. McLaurine, II, p. 3 at line 15 to p. 4 line 15).

Frank deGraffenried is the Chief of Police. (See Exhibit "C" Affidavit of Frank deGraffenried at ¶1). Bill James is the Public Safety Director. (deGraffenried Aff. at ¶4). Benji Walker is the Public Safety Deputy Director of Communications. (deGraffenried Aff. at ¶4; see also Exhibit "D" Affidavit testimony of Benji Walker). David Watkins was the City Manager until February 2006, then Charles Duggan became the City Manager and is presently holding that position. (deGraffenried Aff. at ¶4).

**B.    THE NIGHT OF THE ARREST**

In the early morning hours of November 27, 2004, Officer Bean was dispatched to the corner of Toomer Street and Genelda in Auburn, Alabama. (Trial Transcript p. 299 at lines 2-11). The dispatcher advised him that a suspicious or mysterious male was walking in the area, westbound towards Donohue Street. (Trial Transcript p. 299 at lines 12-24). The dispatcher told Officer Bean that the individual in question wore dark pants and had a gray shirt or jacket on. (Trial Transcript p. 300 at line 20 to p. 301 at line 3). While looking for the individual, Officer Bean observed McLaurine, who was the only person walking in the area fitting the description. (Trial Transcript p. 300 at line 14 to p. 301 at line 7). Officer Bean described that McLaurine was walking on the sidewalk on the east side of the street in a very slow manner with his hands in his pocket looking in the area of the houses. (Trial Transcript p. 300 at lines 16-25, p. 329 at lines 12-14).

Officer Bean explained that on the night in question, school was out because of the Thanksgiving holidays and that it is definitely one of the two times of year when burglaries happen.

4

(Trial Transcript p. 302 at lines 1-14).  Officer Bean said that they often put officers on the ground, especially late at night, to walk those areas in an effort to prevent burglaries.  (Id.)  Based on that information, Officer Bean testified that when he gets a call about a suspicious person in that area, it rings a bell with him.  (Trial Transcript p. 302 at lines 18-22).

Officer Bean was in a marked patrol car and he was wearing a uniform.  (Trial Transcript p. 303 at line 22 to p. 304 at line 1). He initially called to McLaurine saying "hey, stop" but McLaurine ignored him.  (Trial Transcript p. 303 at lines 5-7).  After asking McLaurine to stop for a second time, he did.  (Trial Transcript p. 303 at lines 14-17).

Officer Bean asked McLaurine who he was and why he was there.  (Trial Transcript p. 303 at lines 20-21).  McLaurine responded: "Officer, I don't have to answer those questions."  (Trial Transcript p. 304 at lines 6-7).  Officer Bean  responded by saying: "Do you have any weapons on you? ... all I need is to see some I.D. and you can be on your way ... but I have to see some I.D. or you need to tell me your name or something."  (Trial Transcript p. 304 at lines 15-21).  McLaurine refused to respond.  (Id.)  Officer Bean said that he asked this information of McLaurine approximately 24 times before arresting him.  (Trial Transcript p. 304 at line 22 to p. 305 at line 2).  The time between McLaurine being approached and his arrest was less than thirty minutes.  (Trial Transcript p. 305 at lines 3-8).

McLaurine does not dispute that he did not stop when he was first asked to do so by Officer Bean.  (McLaurine Depo. p. 110 at lines 13-23).  McLaurine does not dispute that for the second time Officer Bean said, "excuse me, sir" and McLaurine stopped.  (McLaurine Depo. p. 113 at lines 16-22).  McLaurine states:

> Q.    Was he polite to you when he asked you to stop those first two times?
>
> A.    Yes.  In fact, he was very polite and probably the most police officer up until he made the racial comments.  I remember the first thing I asked him was - - when he asked for identification as why do you want to know and his response

> was, because we got a call about somebody carrying something.
>
> Q.     Now, why didn't you comply at that point?
>
> A.     Because I did not believe that was a sufficient reason to require me to comply.
>
> Q.     So what.
>
> A.     First of all, the other issue I understood to be was that I was not legally required to present it in that particular situation.
>
> Q.     Mr. McLaurine, I'm not - - I don't mean to interrupt, but that is based on your legal opinion of cases that you have read.
>
> A.     Right.

(McLaurine Depo. p. 113 at line 23 to p. 114 at line 19).

McLaurine said that he believed the quickest way for him to get to the Subway Restaurant was to refuse to comply with the police officer's orders. (McLaurine Depo. p. 117 at line 22 to p. 118 at line 4). McLaurine says that he is aware of an individual leaving without answering a police officer's questions based on a CSI episode. (McLaurine Depo. p. 118 at line 5 to p. 119 at line 21).

Eventually, Officer Bean called the shift supervisor, Lt. Mathews. (Trial Transcript p. 305 at lines 9-17, p. 331 at lines 6-17). Officer Bean explained to McLaurine that he was going to call his supervisor because he did not want to arrest McLaurine. (Trial Transcript p. 305 at lines 19-25). Officer Bean hoped that his supervisor would know some other way to talk to McLaurine. (Id.) When Lt. Mathews arrived, he talked to McLaurine in the same manner that Officer Bean had talked to McLaurine. (Trial Transcript p. 306 at lines 13-19). Lt. Mathews testified that McLaurine said that he did not need to provide that information.(Trial Transcript p. 332 at lines 16-25). Lt. Mathews said he asked a full set of questions four to five times and made it clear that McLaurine was breaking the law and would subsequently be arrested if he did not comply. (Trial Transcript p. 333 at lines 4-10). Lt. Mathews again explained to McLaurine that McLaurine had been contacted because a dispatcher issued a call of a suspicious person in the area fitting his

6

description.  (Trial Transcript p. 333 at line 23 to p. 334 at line 23).  Even after having that full

explanation and being told that he would be free to go as long as there were not any outstanding

warrants or other legal issues, McLaurine refused to cooperate.  (Trial Transcript p. 334 at line 24

to p. 335 at line 1).  There was even a discussion between Lt. Mathews and McLaurine regarding

a recent United States Supreme Court decision regarding a citizen's compliance with an officer's

request for information, but McLaurine disagreed that he had to answer questions.  (Trial Transcript

p. 335 at lines 2-19).  McLaurine told them that he was not going to give them anything.  (Id.)

McLaurine says that Lt. Mathews:

> again attempted to communicate the fact that when you are - - his
> belief, that when you are stopped by the police, you have to provide
> this information regardless of the situation and - - whenever they
> contact you, that was another phrase that was used by Officer
> Perkins at the first stop of the issue - - and reiterated that particular
> issue and I wanted on to say that I disagreed and that I did not find
> that the reasons they presented to me at the time were to be
> sufficient for me to even consider it.

(McLaurine Depo. p. 122 at lines 8-20).  In short, McLaurine does not deny that Lt. Mathews asked

him to comply and McLaurine refused.  (McLaurine Depo. p. 122 at line 21 to p. 123 at line 1).

McLaurine first told Officer Bean and then Lt. Mathews that he simply disagreed with their

interpretation of the law about what he was required to do.  (Trial Transcript p. 306 at line 20 to p.

307 at line 7).

McLaurine threatened to leave unless he was physically detained at which time Lt. Mathews

placed a hand on McLaurine's arm and said he was being physically detained.  (Trial Transcript p.

338 at lines 5-22; McLaurine Depo. p. 123 at line 19 to p. 124 at line 6).  At that time both officers

took him by the arm but he was not hurt.  (McLaurine Depo. p. 124 at lines 5-14).

After Lt. Mathews was unsuccessful with McLaurine, he instructed that McLaurine be

watched and called the shift commander, Lt. Howell,  the highest ranked person on duty that night

with the Auburn Police Department.  (Trial Transcript p. 307 at lines 12-19, p. 336 at lines 17-25,

p. 307 at line 22 to p. 308 at line 1, p. 307 at lines 5-11).  Because it took him a few minutes to arrive, Lt. Howell learned on the way to the location that McLaurine was refusing to give his name and information about his reason for being in the area.  (Trial Transcript p. 347 at lines 20-25).  Lt. Howell had actually already heard the dispatch about a suspicious person.(Trial Transcript p. 348 at lines 4-5).  Lt. Howell came to the scene.  (Trial Transcript p. 309 at lines 6-7).  Lt. Howell repeated the same things to McLaurine about needing to present his name and number and McLaurine would be free to go, but McLaurine refused.  (Trial Transcript p. 309 at lines 11-18).  The conversation between Lt. Howell and McLaurine was very similar to the conversations with Officer Bean and Lt. Mathews.  (Trial Transcript p. 349 at lines 5-20).  Lt. Howell explained that he needed to comply with the law and turn over his name and identification or he was going to be arrested.  (Id.).  McLaurine said that he did not agree with the law in that area and for them to do what they had to do.  (Id.; see also Trial Transcript p. 339 at lines 18-24 and p. 340 at lines 2-4).

McLaurine admits that he could have complied and walked away.  (McLaurine Depo. p. 137 at lines 17-21).  McLaurine was placed under arrest by Officer Bean and patted down.  (Trial Transcript p. 340 at lines 12-25).  During that process, a Colorado identification card was located on McLaurine's person. (Trial Transcript p. 341 at lines 1-4). McLaurine was placed in the car and Officer Bean called in to the dispatcher to tell them that McLaurine had been charged with "10-8, obstructing."  (Trial Transcript p. 312 at lines 7-15).   McLaurine does not have any complaints about the way he was transported to the jail nor the way he was treated in the jail by Officer Bean.  (McLaurine Depo. p. 138 at line 11 to p. 140 at line 9).

When Officer Bean took the cuffs off McLaurine at the police station, McLaurine inquired if he was being charged with a crime.  (Trial Transcript p. 312 at line 21 to p. 313 at line 10).  Officer Bean told him that he had been officially charged with obstructing governmental operations at the scene.  (Id.)  At that point, McLaurine provided his name and information.  (Trial Transcript p. 313 at lines 11-13).

During the conversations that night, Officer Bean stated that he explained to McLaurine that crime went up in that particular area during certain times of the year. (Trial Transcript p. 314 at line 19 to p. 315 at line 4). Officer Bean explained that based on the foregoing, he needed to have McLaurine's name and identifying information before allowing him to go on. (Id.) Officer Bean also explained that McLaurine fit the description of a person who had been described as acting suspicious. (Trial Transcript p. 315 at lines 5-9).

Officer Bean testified that he did not feel that McLaurine was acting normal when he approached him which is why he asked McLaurine if he could pat him down for weapons. (Trial Transcript p. 321 at lines 11-25). Officer Bean also felt threatened by the fact that McLaurine said, "if you are done with me, I'm leaving" and then tried to walk away. (Trial Transcript p. 321 at lines 11-17). Officer Bean unequivocally states that he would have let McLaurine go if he had complied with the law. (Trial Transcript p. 325 at lines 3-5). Officer Bean further testified that he believed that McLaurine was attempting to hinder the investigation.(Trial Transcript p. 326 at lines 1-5).

After the arrest, McLaurine was convicted in both municipal court and circuit court. The conviction has been upheld by the Alabama Court of Criminal Appeals. (See Exhibit "E", Court of Criminal Appeals Opinion). It is undisputed that McLaurine was allowed to testify at his trial and cross-examine the individuals who testified. (McLaurine Depo. p. 140 at line 14 to p. 141 at line 5). McLaurine fully understands that because the Circuit Court trial was *de novo,* he was not in anyway prejudiced by anything that happened in City Court. (McLaurine Depo. p. 142 at lines 6-18).

C.    MCLAURINE'S CLAIMS

1.    THE DISPATCHERS

McLaurine complains that the dispatchers acted wrongly by telling Officer Bean that the individual in question was looking at houses, when the caller did not actually say that. (McLaurine

Depo. p. 151 at line 21 to p. 152 at line 8). He further believes that the dispatcher should have initially told the police officer that the guy who made the call gave his name as Ron and that he thought Ron was a fake name. (McLaurine Depo. p. 152 at lines 12-18). McLaurine does not allege that the dispatchers should have never contacted Officer Bean. (McLaurine Depo. p. 153 at lines 2-19). Rather, McLaurine alleges that the information from the dispatcher should have been more accurate, i.e., the dispatcher should not have used the word "suspicious" but used the word "mysterious" as used by the caller. (Id.) McLaurine further opines that if the correct information would have been given, it would have prevented Officer Bean from having a reasonable suspicion, relying on what he considers an error of using the word "houses." (Id.) However, McLaurine admits that a dispatcher does not really know what is going on other than to transmit the call so that a police officer can investigate the situation to determine the facts. (McLaurine Depo. p. 153 at line 1 to p. 154 at line 2). He further agreed that he was not arrested for looking at houses, but arrested for not complying with police orders. (McLaurine Depo. p. 154 at lines 3-16). McLaurine admits that if the dispatcher had sent the information exactly as he is stating the dispatcher should have, he still would not have provided the information requested by the officers. (McLaurine Depo. p. 155 at lines 9-15).

Mr. Walker testified that dispatchers are trained and supervised regarding how to take and transmit calls that come in regarding potential criminal activity ( Walker Aff. at ¶4). According to that procedure, dispatchers are to call the officer so immediate action can be taken (Id.) He also states that no procedure was breached during the incident in question. (Id. at ¶5).

### 2.    OFFICER BEAN

McLaurine alleges that Officer Bean unreasonably stopped him, arrested him without legal grounds, and used racial discrimination for intimidation while in custody. (McLaurine Depo. p. 155 at lines 16-21).

Officer Bean testified that he was trying to joke around with McLaurine to get him to talk, and at one point while they were waiting for Lt. Howell to arrive on the scene, asked McLaurine if he was not answering his questions because Officer Bean was black. (Trial Transcript p. 310 at lines 5-17). Officer Bean further testified that during his sixteen years on the force, he found that certain people responded differently to different officers. (Trial Transcript p. 319 at line 25 to p. 320 at line 1). Officer Bean explained to McLaurine that he had a situation early in his career wherein an individual would not speak to him or answer his questions because the man was a member of the League of Confederate States. (Trial Transcript p. 320 at lines 14-25). Officer Bean asked McLaurine if that was McLaurine's problem. (Id.)

McLaurine testifies as follows in regard to his allegations against Officer Bean:

A.    ... and this was the period in which I stopped responding to most questions from Officer Bean. It was during this period that he made - - asked the questions, is it because I'm Black? What nation do you work for? Is it because you work for the Confederate government? Because I know some people who do.

(McLaurine Depo. p. 124 at line 20 to p. 125 at line 6). These statements were made after McLaurine had indicated that he was going to walk off, but no one was holding him and he was not cuffed at the time. (McLaurine Depo. p. 126 at line 5 to p. 127 at line 6). Moreover, Lt. Mathews, who is white, was present during the questions. (McLaurine Depo. p. 127 at lines 7-9).

As it relates to the question "are you not answering my questions because I'm Black?", McLaurine states that he believes that is racially discriminatory because it assumed he was a racist because he is white. (McLaurine Depo. p. 127 at line 19 to p. 128 at line 3). As it relates to the questions: "what nation are you with?" and "do you work for the Confederate government?", McLaurine stated that although the statements were not racially discriminatory on their face, he believes they were being asked because he is white. (McLaurine Depo. p. 129 at line 12 to p. 130 at line 2). However, McLaurine readily admits that he was asked these questions by Officer Bean because he would not comply with Officer Bean's request to provide his name and address.

11

(McLaurine Depo. p. 130 at lines 3-10). McLaurine says he understands that there are individuals in organizations in the United States who do not feel they have to comply with authoritative figures. (McLaurine Depo. p. 131 at lines 12-17). McLaurine said that regardless, he was offended by the use of the word "Confederate" or the indication that he was against the government because he was white. (McLaurine Depo. p. 131 at line 18 to p. 132 at line 11). There was nothing else that Officer Bean did upon which McLaurine bases his claim that he was subjected to race discrimination. (McLaurine Depo. p. 133 at lines 3-9).

McLaurine concedes that Officer Bean was polite to him. (McLaurine Depo. p. 113 at line 23 to p. 114 at line 2). deGraffenried states that he has never had a complaint that Officer Bean treated any individual unfavorably because they were white. (deGraffenried Aff. at ¶ 4).

### 3.    Lt. Mathews

McLaurine says that Lt. Mathews was sued because he was there during the first racial comment and is Officer Bean's supervisor. (McLaurine Depo. p. 156 at lines 1-11). McLaurine claims that it was a failure on Lt. Mathews' part to not stop the racial questions. (Id.) McLaurine also bases his false arrest claim against Lt. Mathews on the fact that Lt. Mathews was involved in the arrest. (McLaurine Depo. p. 156 at line 21 to p. 157 at line 3).

### 4.    Lt. Howell

McLaurine sued Lt. Howell because he was the person who made the decision that McLaurine would be arrested. (McLaurine Depo. p. 157 at lines 4-12).

### 5.    Chief deGraffenried

McLaurine sued Chief deGraffenried because he believes he has failed to properly train Lt. Howell, Lt. Mathews and Officer Bean and all the officers under his command because he has given his consent for them to stop individuals walking in high crime areas. (McLaurine Depo. p. 157 at line 16 to p. 158 at line 11). While McLaurine challenges the training of police officers, he

admits that he is not directly familiar with it. (McLaurine Depo. p. 158 at lines 12-17). He does not know what hands-on training Chief deGraffenried is actually responsible for. (McLaurine Depo. p. 158 at lines 18-20). McLaurine also says that his claims against Chief deGraffenried are based on some issue involving the municipal judge Joe Bailey, Bobby Lowder and Colonial Bank. (McLaurine Depo. p. 158 at line 21 to p. 164 at line 21). McLaurine's explanation about the connection seems to rest specifically on the notion that the City tries to avoid lawsuits that would uncover illegal activities. (McLaurine Depo. p. 163 at line 23 to p. 164 at line 6). McLaurine also says that he believes Judge Bailey discourages civil lawsuits of any type against the City. (McLaurine Depo. p. 165 at line 23 to p. 166 at line 6). However, it never became clear exactly how that related to any cause of action he had stated against Chief deGraffenried. (McLaurine Depo. p. 158 at line 23 to p. 167 at line 12).

Chief deGraffenried has plainly testified that the City consistently provides education and training to its law enforcement officers regarding the proper manner in which they should question individuals and under what circumstances it is appropriate to make an arrest. (deGraffenried Aff. at ¶2).

### 6.   WATKINS, JAMES, WALKER AND DUGGAN

David Watkins was the City Manager and McLaurine brings this lawsuit against him for failure to train and supervise. (McLaurine Depo. p. 167 at lines 13-23). Chief deGraffenried, not the other Defendants, are responsible for training the officers. (DeGraffenried Aff. at ¶2). Charles Duggan is the present City Manager and is sued for failure to train and supervise, and is also sued because when McLaurine spoke with Mr. Duggan about what occurred, Mr. Duggan told him to wait and see what the judge decided in his case. (McLaurine Depo. p. 168 at line 14 to p. 169 at line 6). McLaurine admits that, in fact, he was convicted in court and, if such was valid, that a

reasonable minded person would believe that no one with the City had done anything wrong. (McLaurine Depo. p. 169 at lines 7-20).

Public Safety Director Bill James is sued for alleged failure to train and supervise. (McLaurine Depo. p. 168 at lines 3-11).

As to all defendants, Chief deGraffenried dispels any notion that the City has a practice, policy or procedure of exercising racial discrimination in the course of questioning individuals, making arrests or otherwise fulfilling the duties of a law enforcement officer. (deGraffenried Aff. at ¶3). He also states that he has not received any complaints against Officer Bean treating white citizens unequally or unfairly until McLaurine's complaint. (deGraffenried Aff. at ¶3).

### D.    PRIOR INCIDENT

In January 2004, deGraffenried received notice through one of his supervisors that McLaurine was complaining about being stopped by the police when he was walking in the early morning hours in an area that had just been victimized by a crime. (deGraffenried Aff. at ¶6). deGraffenried spoke with McLaurine about this incident and wrote him about the incident at McLaurine's request. (Id.) deGraffenried explained to McLaurine that he agreed with the officer's decision to stop McLaurine and tried to make McLaurine understand the circumstances. (Id.) McLaurine was stopped for approximately three minutes. (Id.) McLaurine stated that he had talked to deGraffenried before about the January 2004 incident and the definition of reasonable suspicious under Alabama statutes. (McLaurine Depo. p. 157 at line 16 to p. 158 at line 4). He feels that deGraffenried has a responsibility of making sure that the officers under his command obey the law. (Id.)

### III.
### ARGUMENT AND CONCLUSIONS OF LAW

### A.    STANDARDS GOVERNING SUMMARY JUDGMENT

The moving party bears the initial burden of informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact. *Gonzalez v. Lee County Housing Authority*, 161 F.3d 1290, 1294 (11th Cir. 1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986)); Fed.R.Civ.P. Rule 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* supra, 477 U.S. at 323. The moving party's burden may be met either by demonstrating that there is no evidence of a dispute of material fact or by demonstrating that the non-moving party has failed to make a showing "sufficient to establish the existence of an element essential to that party's case, and on which [he] will bear the burden of proof at trial." *Celotex*, supra, 477 U.S. at 322; see also *Real Estate Financing v. Resolution Trust Corp.*, 950 F.2d 1540, 1543 (11th Cir. 1992) ("One way to seek an award of summary judgment is for the moving party to demonstrate that an essential element of the non-movant's case is lacking.").

After the moving party has met its burden under Rule 56(e), the non-moving party must go beyond the pleadings and designate specific facts from affidavits, answers to interrogatories and/or depositions showing that there is a genuine issue for trial. *Celotex*, supra, 477 U.S. at 322. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

The Eleventh Circuit Court of Appeals has held that where the movant meets the initial burden of showing either that there are no genuine issues of material fact or the absence of evidence to support the non-moving party's case, the burden then shifts to the non-movant to show the existence of a genuine issue of material fact. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116

15

(11th Cir. 1993). The court in *Fitzpatrick* held for issues on which the non-movant would bear the burden of proof at trial as follows:

> For issues on which the non-movant would bear the burden of proof at trial, the means of rebuttal available to the non-movant vary depending on whether the movant put on evidence affirmatively negating the material fact or instead demonstrated an absence of evidence on the issue. Where the movant did the former, then the non-movant must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated. Where the movant did the latter, the non-movant must respond in one of two ways. First, he or she may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence. *Celotex*, 477 U.S. at 332, 106 S.Ct. at 2557 (Brennan, J., dissenting). Second, he or she may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. (citation omitted).

*Fitzpatrick*, supra,  2 F.3d at 1116.

### B. A Summary of Plaintiff's Causes of Action and Defendants' Arguments

In Count I, McLaurine brings a claim for false arrest and alleges that said arrest was a violation of his civil rights. He claims damages against Officer Bean, Lt. Mathews, Lt. Howell, unnamed dispatchers and the City of Auburn. In Count II, he alleges that Chief deGraffenried, Public Safety Director James, Pubic Safety Deputy Director Walker, prior City Manager Watkins and present City Manager Duggan had the responsibility of supervising and training the unnamed dispatchers, the police chief and officers in question. Based on that allegation, McLaurine claims that said conduct constitutes the tort of negligence which is a violation of his civil rights. Plaintiff claims the City of Auburn is liable for said tort under the master agent theory of liability. Count III is stated against Officer Bean and the City of Auburn based on questions that Officer Bean asked McLaurine prior to his arrest which Plaintiff characterizes as being racially motivated and meant to intimidate and deny equal treatment under the laws as a violation of his civil rights. Count IV of the

Complaint alleges that Lt. Mathews failed to react appropriately to the questions asked by Officer Bean and such was negligent failure to supervise; that deGraffenried and Watkins had failed to supervise and train the officers under their command; that based on the foregoing, the City of Auburn is liable through the master agent theory of liability; and that deGraffenried and Lt. Mathews are also liable.  Plaintiff seeks no monetary relief for this cause of action but only requests that there be anti-discrimination training for deGraffenried and the City of Auburn employees, and that the City of Auburn be barred from conducting internal investigations into discrimination complaints made by or against employees of the City of Auburn without notifying the Department of Justice.

Defendants assert that it is impossible for McLaurine to maintain any of his causes of action because it is undisputed that an underlying constitutional violation did not occur.  His criminal conviction has been affirmed.  Moreover, Defendants maintain that the individual Defendants should be afforded qualified immunity for their actions in that McLaurine does not deny the undisputed facts of the case but continues to maintain that he disagrees with the law allowing the officers to question him and arrest him under the circumstances.  To the extent that McLaurine is stating state law causes of action, his claims are barred by the available immunities to the Defendants, his failure to allege intentional conduct and his failure to provide a breach of duty owed to him.  Again, his conviction has been affirmed.

C.    SECTION 1983

Although it is not completely clear, it would appear that each of Plaintiff's claims are brought pursuant to §1983 and allege some type of constitutional violation.  Defendants will assume the allegations are false arrest, violation of the Equal Protection Clause and failure to properly train constituting a policy or custom of undefined constitutional violations.  McLaurine cannot maintain any of these claims.  To the extent that McLaurine attempts to make a constitutional violation claim

17

based on negligence, such claim fails as a matter of law.  See Daniels v. Williams, 474 U.S. 327 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

Section 1983 provides a remedy for deprivation of federally protected rights caused by persons acting under the color of state law.  Almand v. DeKalb County, 103 F.3d 1510, 1512 (11th Cir. 1997).  "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144, n.3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).  McLaurine must prove that a state actor deprived him of a right conferred by a federal statute or by the Constitution.  See Griffin v. City of Opa-Locka, 261 F.3d 1295, 1313 (11th Cir. 2001).  "A §1983 complainant must support his claim with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations." Bluitt v. Houston Independent School Dist., 236 F.Supp.2d 703, 719 (S.D.Tex. 2002)(citing Schultea v. Wood, 47 F.3d 1427, 1433 (5th Cir. 1995); Fee v. Herndon, 900 F.2d 804, 807 (5th Cir.), cert. denied, 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 233 (1990); Jacquez v. Procunier, 801 F.2d 789, 793 (5th Cir. 1986); Angel v. City of Fairfield, 793 F.2d 737, 739 (5th Cir. 1986); Elliott v. Perez, 751 F.2d 1472, 1482 (5th Cir. 1985)); see also Dalrymple v. Reno, 334 F.3d 991, 996 (11th Cir. 2003).

As to the City of Auburn, a local governmental body cannot be found liable under §1983 on a respondeat superior theory.  City of Oklahoma City v. Tuttle, 471 U.S. 808, 828, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).  The City is only liable for its own acts, not for the acts of its employees. See Monell v. Dept. of Social Servs., 436 U.S. 658, 690-91, 98 S.Ct.2018, 56 L.Ed.2d 611 (1978). "Local governments are directly liable under §1983...for constitutional deprivations resulting from (1) an unconstitutional action taken pursuant to an officially promulgated policy statement, decision, regulation or ordinance; or (2) governmental custom, even though not authorized by written law." Martinez v. City of Opa-Locka, Fla., 971 F.2d 708, 713 (11th Cir.1992) (citing Monell, supra, 436

18

U.S. at 690-91).  McLaurine must prove that an official policy or custom of the City was a "moving force" behind the alleged constitutional deprivation.  See *Farred v. Hicks*, 915 F.2d 1530, 1532-33 (11th Cir. 1990).  Further, "each and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff".  Quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir.), cert denied, 534 U.S. 820 (2001)(following *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)); See also *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998)(also following *Brown*, supra, 520 U.S. at 407). McLaurine does not properly plead (and certainly does not "specifically identify") a constitutional violation and did not plead that the City of Auburn violated §1983 pursuant to a practice, policy or custom.  Rather, such claim was presented through a response to Defendants' Motion to Dismiss and allowed as an amendment.  As such, the §1983 claims are due to be dismissed as a matter of law.  Regardless, liability could not be established against the City or any individual defendant.[5]

### 1.    OFFICIAL CAPACITY CLAIMS AGAINST INDIVIDUAL DEFENDANTS

Any claims made against the employees in their official capacity are due to be dismissed as a matter of law.  See *Hardy v. Town of Hayneville,* 50 F.Supp.2d 1176, 1185 (M.D. Ala. 1999) (holding that official capacity claims against local government officials were no longer necessary because local government entities could be sued directly for damages injunctive or declaratory relief).

### 2.    QUALIFIED IMMUNITY

All individual Defendants are entitled to qualified immunity for the §1983 claim brought against them in their individual capacity.  Qualified immunity is designed to protect and "allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation".  Quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)(citing *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987)).   Once the

---

[5] Defendants maintain that §1983 claim is not made based on a specific constitutional violation and that pursuant to the heightened pleading standard, any §1983 claim is due to be dismissed.

defendants raise qualified immunity as a defense, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate. *Ferraro*, supra, 284 F.3d at 1194. Qualified immunity protects the defendant from plaintiff's damages claims in his individual capacity if he can establish that he acted within his discretionary authority in a manner that violated no "clearly established statutory or constitutional rights of which a reasonable person would have known" (or in "good faith"). *Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir. 2000)(citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Therefore, the first question to be answered by the Court is whether the Defendants were "acting within the scope of his discretionary authority when the alleged wrongful acts occurred." *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)(quoting *Rich v. Dollar*, 841 F.2d 1558, 1563-64 (11th Cir. 1988)).

### a.    DISCRETIONARY ACTS

Officials act within the scope of their discretionary authority when "[their] actions were undertaken pursuant to the performance of [their] duties and within the scope of [their] authority." *Rich*, supra, 841 F.2d at 1564 (internal citations omitted). There can be no dispute that the officers' (Bean, Howell and Mathews) acts of questioning McLaurine and then arresting him were discretionary acts taken within their authority as law enforcement officers. See *Thomas v. Harvard*, 2006 WL 938748 (N.D. Ga.). Moreover, the conduct or actions complained of against the other individual Defendants in the first Amended Complaint strictly regards their conduct in the line and scope of their jobs in that Plaintiff alleges they failed to train and supervise the dispatchers and police officers regarding the arrest (and Officer Bean's questions). Such conduct is discretionary in that the allegations presuppose supervisory responsibility. See e.g. *Hardy v. Town of Hayneville*, 50 F.Supp.2d 1176 (M.D. Ala. 1999).

Each of the actions taken by the Defendants required them to use their discretion. Accordingly, the Defendants were acting within their discretionary authority at all times during their interaction with McLaurine or their supervision of each other.

### b.    TWO-PART QUALIFIED IMMUNITY ANALYSIS

Once the individual defendant has established that he was acting within his discretionary authority, the burden shifts to the plaintiff to establish that qualified immunity is not appropriate. See *Vinyard v. Wilson*, 311 F.3d 1340, 1346-47 (11th Cir. 2002) (citing *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). The Supreme Court has established a two-part analysis for qualified immunity. First, the Court must determine whether the plaintiff's allegations, if true, establish a constitutional violation. Id. If it is established that a constitutional right would have been violated under the plaintiff's version of the facts, the court must determine whether the constitutional right asserted was clearly established. See *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); see also *Ferraro*, supra, 284 F.3d at 1194. In order to show that the law was clearly established, "the right must be so specific that 'in the light of pre-existing law the unlawfulness must be apparent.'" *Gorman v. Roberts*, 909 F.Supp. 1493, 1504 (M.D. Ala. 1995) (quoting *Hansen v. Soldenwagner*, 19 F.3d 573, 575 (11th Cir. 1994)).

### (1) NO VIOLATION OF CONSTITUTIONAL RIGHT

While McLaurine does not specify what his underlying federally protected right is, in his Complaint he references "civil rights violation" and denial of "equal treatment." To the extent that he alleges such violations as his underlying federally protected right, such claims fail. If Plaintiff fails to establish a constitutional deprivation, assuming his facts are true, the §1983 cause of action must necessarily fail entitling Defendants to judgment as a matter of law. See *Spivey v. Elliott,* 41 F.3d 1497, 1499 (11th Cir. 1995).

(a)    THE DISPATCHER CALLS[6]

Although the dispatchers are not named in McLaurine's Complaint, he alleges that they are liable for false arrest in violation of his civil rights pursuant to Count I of his lawsuit.  Aside from the fact that the dispatchers' conduct was indisputably pursuant to the line and scope of their job and in accordance with policy regarding transmitting information to police officers as it is called in, it is undisputed that the dispatchers had nothing to do with the fact that McLaurine was subsequently arrested.  (Walker Aff. at ¶¶4,5; McLaurine Depo. p. 155 at lines 9-15).  McLaurine was arrested because he refused to provide his name, address and information regarding his reason for being in the neighborhood.  (Trial Transcript p. 349 at lines 5-20).  There is no connection between the dispatchers calling Officer Bean to investigate a suspicious person and McLaurine's refuse to properly and lawfully cooperate with the police officers.  Moreover, even if it could be argued that the dispatchers' conduct somehow related to the fact that McLaurine was ultimately arrested, certainly there is no indication that this conduct constituted a civil rights violation.  Again, the civil rights violation alleged is one of false arrest and the dispatchers were in no way connected to the arrest.

Accordingly, in that there can be no constitutional violation stated against the dispatchers, any attempted claim by McLaurine against the dispatchers is due to be dismissed as a matter of law.

(b)    THE QUESTIONING AND ALLEGED RACIAL STATEMENTS PRIOR TO ARREST (THE OFFICERS)

---

[6] As previously set out in the case summary of this matter, McLaurine's requested amendment to add the named dispatchers as parties in this case was not granted.  Therefore, those individuals are not parties to this lawsuit.  However, because the "unnamed dispatchers" were referenced in the initial complaint and because their conduct serves as the basis of some of McLaurine's allegations,  Defendants address whether the dispatchers' actions in this case were a constitutional violation.  However, Defendants do not intend to waive their position that no lawsuit can be maintained against the dispatchers.

McLaurine alleges that the questioning of him which led to his arrest was improper, but he did not state a specific cause of action for being stopped for questioning. Rather, Count I addresses the actual arrest that took place which is addressed herein below. To the extent that there is any interpretation that the idea of questioning McLaurine (outside of the three questions he calls "racial") is alleged as a constitutional violation, said allegation would be meritless. It is undisputed that the officers simply wanted McLaurine to identify himself so that they could dispel any notion that he was engaged in criminal activity in the area. Chief deGraffenried makes it clear that such was pursuant to policy and that procedures were followed during this incident (deGraffenried Aff. at ¶¶3, 7). Said conduct does not rise to the level of a constitutional violation especially since McLaurine admits that he could have complied and been on his way. (McLaurine Depo. p.132 at lines 7-15). Regardless, it appears that McLaurine's legal allegation is that the situation manifested itself into a false arrest. Under City policy and controlling law, it was proper to question McLaurine under the circumstances. (deGraffenried Aff. at ¶ 3 and 7). McLaurine does not deny that dispatch called Officer Bean about a suspicious individual, that Office Bean observed McLaurine walking slow and looking at houses in a deserted area or that McLaurine's activity was otherwise not normal under the circumstances. Rather, McLaurine disagrees that said facts meet the standard necessary to stop McLaurine. Plaintiff's disagreement regarding the circumstances or his misunderstanding regarding the law does not create a constitutional violation.

McLaurine brings Counts III and IV based on the allegation that he was subjected to racially discriminatory statements for the purpose of intimidation and unequal treatment by Officer Bean during the pre-arrest interaction with McLaurine.

The three statements to which McLaurine complains cannot be reasonably classified as racially derogatory statements. As to the first question regarding whether McLaurine was refusing to answer his questions because Officer Bean was black, same was a comment

23

on Officer's Bean's race, not McLaurine.  Additionally, such does not indicate any racial animus.  As to the other two questions regarding McLaurine's beliefs, such were an appropriate inquiry under the circumstances and again, did not suggest any racial animus on the part of Officer Bean. He was merely trying to determine if McLaurine had any racial animus in an effort to explain McLaurine's behavior. Officer Bean was asking about potential anti-government affiliations because of McLaurine's refusal to cooperate.  Such was a reasonable assumption under the circumstances.  McLaurine testified that Officer Bean was polite to him during their encounter.  Such a characterization flies in the face of the notion that Officer Bean was attempting to be racially derogatory to him.

Moreover, even if the terms could have been considered racially derogatory or intended to demean McLaurine, such statements still did not rise to the level of a constitutional violation such that McLaurine experienced unequal protection.  In order to establish a claim cognizable of the Equal Protection Clause, an individual must prove that he was treated less favorably than others similarly-situated and that the discriminatory treatment was based on some constitutionally protected interest such as race.  *Jones v. Ray*, 279 F.3d 944, 947 (11th Cir. 2001).  The plaintiff must also demonstrate an existence of discriminatory intent.  *Mencer v. Hammonds,* 134 F.3d 1066, 1070 (11th Cir. 1998).  Arbitrary conduct which merely breaks the rules or goes against procedure absent discriminatory intent is insufficient to demonstrate a violation of the Equal Protection Clause.  *Jones v. White,* 992 F.2d 1548 (11th Cir. 1993).  The United States Supreme Court has stated:

> official action will not be held unconstitutional solely because it results in racially disproportionate impact ...Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 264-65, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).

Further:

> discriminatory purpose ... implies more than intent as volition or
> intent as awareness of consequences. It implies that the
> decisionmaker, in this case a state legislature, selected or reaffirmed
> a particular course of action at least in part "because of," not merely
> "in spite of," its adverse effects upon an identifiable group.

*Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870

(1979) (footnote and citations omitted). Moreover, in any §1983 cause of action, the conduct

complained of must regard a right or privilege secured by the Constitution. *Whitehorn v. Harrelson,*

758 F.2d 1416, 1419 (11th Cir. 1985). For example, "threatening, derogatory, or abusive comments

made by correctional officers to an inmate do not rise to the level of a constitutional violation." See

*Thomas v. Campbell,* 2006 WL 1600525 (M.D. Ala.) (citing *McFadden v. Lucas*, 713 F.2d 143 (5th

Cir. 1983); see also *Johnson v. Glick*, 481 F.2d 1028 (2nd Cir. 1973)). Such is the case even when

said derogatory comments consist of racial slurs. (Id.) In the *Thomas* case, the court concluded:

> [B]ecause the actions about which [plaintiff] ... complains failed to
> demonstrate the defendants deprived him of any protected right,
> privilege or immunity, summary judgment is therefore appropriate on
> these claims.

*Thomas*, supra, * 7.

Similar to the case at hand, even if the statements in question could be classified as racial

slurs or racially derogatory statements towards McLaurine, the use of said statements did not

deprive McLaurine of a constitutional right in this incident.

Accordingly, Officer Bean cannot be held liable to McLaurine for a constitutional violation

such that qualified immunity should not be afforded to him. McLaurine also attempts to hold Lt.

Mathews responsible for the alleged racial statements. While it is true that a public official can be

held liable pursuant to §1983 for their failure to act, such can only occur when that official shows

deliberate indifference to unlawful conduct over which he has control. See *McCoy v. Webster,* 47

F.3d 404, 407 (11th Cir. 1995). In making this analysis, McLaurine cannot:

> rely merely on broad legal truisms, requiring officials to "be creative
> or imaginative in drawing analogies from previously decided cases."
> (Id.).  Although the very action in question need not have previously
> been held unconstitutional, the unlawfulness must be apparent in
> light of pre-existing law.  See Anderson, 483 U.S. at 640, 107 S.Ct.
> at 3039.

Buzzi v. Gomez, 24 F.Supp.2d 1352, 1361 (S.D. Fla. 1998).  Certainly as it relates to Lt. Mathews,

there is absolutely no indication that he was on any type of notice that allowing Officer Bean to

continue questioning McLaurine about why he was refusing to comply with their orders was

unconstitutional, assuming he heard Officer Bean's comments.  In short, to the extent that Lt.

Mathews is sued for failing to stop Officer Bean from questioning McLaurine, specifically from

asking the three questions of which Officer Bean complained, this claim must fail because those

statements did not constitute a constitutional violation.  Therefore, it is impossible for Lt. Mathews'

failure to stop the questioning to constitute a constitutional violation.  Even if the questions did

constitute a constitutional violation, Lt. Mathew's failure to stop the questions was not a breach of

a clearly established constitutional right and therefore Lt. Mathews is immune from liability based

on the theory of qualified immunity.  To the extent that Lt. Mathews is sued strictly for failure to train

and supervise, said allegations are addressed herein along with the other individuals with

supervisory authority.

### (c) FALSE ARREST (THE OFFICERS)

To the extent that McLaurine attempts to bring a §1983 claim against the officers and the

City of Auburn for false arrest, his argument fails here as well.  There is no dispute that McLaurine

was arrested for obstructing government operations, that he was convicted in municipal court, that

he appealed his conviction to Circuit Court where he was convicted by a jury and that he appealed

his conviction to the Alabama Court of Criminal Appeals where his conviction was affirmed.  "The

existence of probable cause...is an absolute bar to a §1983 action for false arrest."  Marx v.

Gumbinner, 905 F.2d 1503, 1505-06 (11th Cir. 1990); See also Von Stein v. Brescher, 904 F.2d

572, 584 n.9 (11th Cir. 1990).  "[A] conviction establishes the existence of probable cause to arrest..." *Varnado v. Manager of Cedar Cove Apartment Complex*, 2006 WL 1679698 *1 (M.D.Fla. 2006); See also *Sappington v. Bartee*, 195 F.3d 234, 237 (5th Cir. 1999)(conviction necessarily establishes existence of probable cause in false arrest case).

The United States Supreme Court held that:

> A state prisoner's claim for damages is not cognizable under 42 U.S.C. §1983 if a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence, unless the prisoner can demonstrate that the conviction or sentence has previously been invalidated.

*Edwards v. Balisok,* 520 U.S. 641, 643, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997)(citing *Heck v. Humphrey*, 477, 487, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (internal quotes omitted).

There is no evidence, nor can there be, that McLaurine's conviction has been invalidated. Accordingly, any relief requested by Plaintiff pursuant to §1983 is unavailable pursuant to *Heck v. Humphrey*.   In addition, even if there is *arguable* probable cause, an officer is afforded qualified immunity.  See *Von Stein,* supra, 904 F.2d at 579 (holding that the question of qualified immunity in an arrest scenario is whether the defendant officer had "arguable" probable cause based on the circumstances at hand).

Summary judgment is due to be granted to the officers and the City of Auburn as to any §1983 claim as a matter of law.

> **(d)    TRAINING AND SUPERVISION (MATHEWS, JAMES WATKINS, DEGRAFFENRIED)**

McLaurine seeks to hold numerous individuals liable under a theory of supervisory liability, alleging simply that they did not supervise or train the officers and dispatchers which would have prevented the alleged constitutional violation.  Again, because the questioning of McLaurine, the arrest of McLaurine or with the three questions to McLaurine from Officer Bean did not constitute

27

a constitutional violation, there is no reason to analyze whether supervisory liability exists for the other individual Defendants based on that incident. However, even if McLaurine had established a constitutional violation as it relates to the incident in question, he cannot establish supervisory liability against Walker, deGraffenried, Watkins, Duggan, Mathews or Howell. *Buzzi,* supra, sets out how one must establish supervisory liability pursuant to §1983 succinctly and it is instructive here.

It is true that in some situations, supervisors may be held liable for failing to train their subordinates adequately, but the standard by which a supervisor is held liable is extremely rigorous. *See Braddy,* 133 F.3d at 802. For [one of the defendants] to be dispossessed of qualified immunity, it must be shown that his "acts or omissions were the cause-not merely a contributing factor-of the constitutionally infirm condition." *LaMarca v. Turner,* 995 F.2d 1526, 1538 (11th Cir. 1993), *cert. Denied,* 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994). Section 1983 liability is imposed only where the failure to supervise amounts to deliberate indifference to the constitutional rights of persons to whom the supervisor has a duty to protect. *See Gold v. City of Miami,* 151 F.3d 1346 (11th Cir. 1998)(FN6) to establish deliberate indifference, Plaintiff must present some evidence that [supervisor defendant] knew of the need to supervise [subordinate defendant] in a particular area and made a deliberate or conscious choice not to take any action. *Id.*

FN6. In *Gold* the police chief sued in his individual capacity, was granted qualified immunity on the issue of failure to train based on deliberate indifference, because the court found that a reasonable person in the police chief's position would not have known that such a failure infringed on constitutional rights. *See Gold v. City of Miami*, 121 F.3d 1442, 1447 (11th Cir. 1997).

Supervisory liability can occur under §1983 in two ways: (1) when the supervisor personally participates in the alleged constitutional violation; or (2) when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established through a history of widespread abuse that provides notice to the responsible supervisor of the need to correct the alleged deprivation, and he fails to do so. *See Braddy,* 133 F.3d at 802. "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued

duration, rather than isolated occurrences." *Id.* (citing *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir. 1990)).

*Buzzi*, supra, 24 F.Supp.2d at 1362.

In the case at hand, the only individuals who would have personally participated in an alleged constitutional violation were the other officers, Lt. Mathews and Lt. Howell. Their involvement in that incident is already addressed herein. Without question, the arrest cannot constitute a constitutional violation because of the existence of probable cause. Officer Bean's statements made in front of Lt. Mathews have already been addressed herein. Therefore McLaurine must establish the *causal connection* with all the individual Defendants. However, there is absolutely no evidence that anything that occurred with the dispatchers or any actions occurring with the officer in question would have put the supervising authorities on prior notice that corrective action needed to be taken. Again, at the risk of being redundant, McLaurine cannot establish that a constitutional violation occurred at the time in question. Other than his opinion to the contrary, McLaurine cannot establish that he put anyone on notice of a constitutional violation in regard to police procedure in questioning citizens or arresting individuals where probable cause existed. Certainly, the record is devoid of obvious or flagrant evidence of constitutional violations that need to be corrected. As such, it is impossible under the facts of this case to establish that any of the individual Defendants exercised deliberate indifference to the constitutional rights of persons to whom the supervisor has a duty to protect. As such, all the individual Defendants in the above-styled action are due to be dismissed based on qualified immunity as a matter of law.

### (2)    Clearly Established Law

As discussed above, as part of the two-part analysis, Plaintiff must not only establish a constitutional violation, but said violation must be clearly established in the law. *Gorman,* supra. Here, the analysis is unnecessary because Plaintiff cannot establish an underlying constitutional violation. For the sake of argument, if Plaintiff could establish a constitutional violation, he is

certainly unable to point the court to any case authority which would clearly set out to the Defendants that there specific actions in question were a violation of a constitutional right. As such, Plaintiff's claims fail as a matter of law because the individual defendants are to be granted the protections of qualified immunity. See *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

### 3.    CITY OF AUBURN

McLaurine has not and cannot identify a policy of the City which was the moving force behind any alleged violation of his federally protected rights. (deGraffenried Aff. at ¶¶2,3). Moreover, as discussed above, because there was no constitutional violation, the City cannot be held liable to McLaurine.

The Chief of Police made the City of Auburn's policy regarding questioning individuals and arrest clear and there is no evidence that the City had a policy of acting in a racially derogatory manner during interaction with individuals or during arrest. (deGraffenried Aff. at ¶¶2-3). Chief deGraffenried testified that the officers were trained regarding equal treatment of individuals and questioning procedure. (deGraffenried Aff. at ¶¶3,4). Absent a policy, McLaurine must demonstrate that the City had a "longstanding and widespread" custom of violating the federally protected rights of its citizens. See *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991); See also *Monell*, supra, 436 U.S. at 694. He presents no evidence of any such custom in regard to his being stopped by the police, questioned or the manner in which he was arrested.

The third instance in which the City can be held liable pursuant to §1983 is if a decision was made by an official who possesses "final authority to establish municipal policy with respect to the action ordered." *Hamilton v. Montgomery County Bd. of Educ.*, 122 F.Supp.2d 1273, 1289 (M.D. Ala. 2000) (citing *Brown*, supra, 923 F.2d at 1480). However, the Eleventh Circuit has held that §1983 liability cannot be established based on a subordinate official's decisions if the final

policymaking body had the right to exercise its own discretion.  *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997).  Additionally, where the City has adopted a policy, any alleged deviation from that policy by an employee of the City does not represent policy of the City.  See *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1173 (11th Cir. 2001), vacated on other grounds, 536 U.S. 953 (2002).  Accordingly, even if the individual Defendants had committed some wrongful act, such act would be insufficient to establish liability against the City of Auburn in that it has a clear policy regarding questioning and arrest procedures.  (deGraffenried Aff. at ¶¶2,3).

   None of the Defendants committed any act against McLaurine that violated his federally protected rights. There is no question of fact regarding an underlying violation, therefore, no inquiry into policy or custom is necessary. Regardless, McLaurine cannot point to and does not identify any policy or custom of the City that caused some violation (assuming any violation could be established) and he cannot establish a custom of discriminating against individuals of Caucasian race (or any other class of individuals) that is so permanent and well-settled with the City that it has the force and effect of law.

   In regard to §1983's liability against the City, it is true that inadequate police training may result in a §1983 claim being maintained against a municipality, but such is the case only where the failure to train amounts to deliberate indifference to the rights of the individual with whom the police came into contact. See *City of Canton v. Harris*, 489 U.S. 378, 388-89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).  That is, the failure to train or supervise must be a City policy and that policy must cause the employees to violate a citizen's constitutional right.  *Gold,* supra, 151 F.3d at 1350. The *Gold* court has stated:

> To establish a "deliberate or unconscious choice" or such "deliberate indifference," a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action ... [The Eleventh Circuit] repeatedly has held that without notice of a need to train or supervise in a particular area, a

> municipality is not liable as a matter of law for any failure to train and supervise.

Id. (citations and footnotes omitted).  McLaurine had conversation with deGraffenried regarding a prior incident where he was stopped by police officers.  (deGraffenried Aff. at ¶ 6).  He was unsatisfied with the fact that deGraffenried did nothing after having this information.  However, McLaurine's argument is fatally flawed because it assumes that his conversation with deGraffenried (a) put Chief deGraffenried on notice that some actions causing a constitutional violation were occurring, and (b) that Chief deGraffenried intentionally or deliberately chose to do nothing to correct the action.  Chief deGraffenried was never placed on notice that constitutional violations were occurring because he did not believe any wrongful conduct occurred based on the circumstances as even McLaurine admits existed (deGraffenried Aff. at ¶ 7) and because he has never been notified that Officer Bean treated white individuals unfairly or unequally until McLaurine filed this claim.  (deGraffenried Aff. at ¶ 4). On the contrary, deGraffenried explains that McLaurine was upset about being stopped by the police on a prior occasion.  (deGraffenried Aff. at ¶6).  Chief deGraffenreid told McLaurine that McLaurine was walking in the early morning hours where criminal activity had taken place.  (deGraffenreid Aff. at ¶ 6).  Regardless of how this conversation was interpreted by McLaurine, there is no evidence that Chief deGraffenried considered himself on notice of wrongful conduct.  In fact, he did not.

More importantly, the issue of custom and policy and whether a failure to train can constitute a custom and policy on behalf of the City only comes into question if the plaintiff first establishes an underlying constitutional violation.  It is undisputed that such cannot be established here.  However, for the sake of argument that it could, it is undisputed that McLaurine cannot identify the municipal policy created by lack of training or otherwise, and then demonstrate an affirmative link between the policy and the particular violation alleged.  *Griffin v. City of Canton, AL,* 932 F.Supp. 1359, 1370 (M.D. Ala. 1996) (citing *Tuttle,* supra, 471 U.S. at 823).

In *Harper v. City of Dothan,* 353 F.Supp.2d 1189 (M.D. Ala. 2004), the court reemphasized the Eleventh Circuit's instruction that a city is not automatically liable under §1983 even if it inadequately trained or supervised its police officers and those officers violated the plaintiff's constitutional right.

> "Instead, the Supreme Court has explained that there are only 'limited circumstances' in which an allocation or failure to train or supervise can be the basis for liability under §1983. The Supreme Court has instructed that these 'limited circumstances' occur only when the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that policy causes the employee to violate a citizen's constitutional rights."

Id. at 1197 (citing *Gold,* supra, 151 F.3d at 1350 (internal citations omitted)). In the case at hand, McLaurine does not point to any specific lack of training. In his deposition when asked what the supervisory individuals did wrong, he simply states that they failed to supervise or train. In essence, he is asking the Court to hold the City of Auburn liable based on a *respondeat superior* theory. Such is not a permissible basis in which to establish municipal liability. See *Harper,* supra, 353 F.Supp.2d at 1198.

Based on the foregoing, it is undisputed that McLaurine has failed to establish a constitutional violation. If he has, he has without question failed to establish any theory of liability in which to maintain this cause of action against the City of Auburn. Accordingly, the City is entitled to summary judgment on McLaurine's §1983 claim.

**D.    STATE LAW CLAIMS[7]**

**1.    STATE LAW IMMUNITY**

---

[7] It is difficult to tell whether McLaurine is asserting state law causes of action or is making claims of negligence and false arrest strictly as part of an undefined constitutional violation claim. In an abundance of caution, Defendants briefly address said claims as if they had been brought as state law causes of actions but do not waive the fact that McLaurine fails to properly plead said claims if such was his intent.

The officers are immune from suit on any state law claim pursuant to the doctrine of discretionary function immunity based on *Ala. Code* §6-5-338(a)(1975), and pursuit to the doctrine of state-agent immunity as established in *Ex Parte Cranman*, 792 So.2d 392 (Ala. 2000).

Pursuant to Alabama statutory law:

> every peace officer ... whether appointed or employed as such peace officer by the state or county or municipality thereof ... shall at all times be deemed to be officers of the state, and as such shall have immunity from tort liability arising out of his or her conduct and performance of any discretionary function within the line and scope of his or her law enforcement.

*Ala. Code* §6-5-338(a)(1975).

The Eleventh Circuit recognized that "[i]n Alabama, law enforcement officials ... enjoy statutory immunity from suit for performance of any discretionary function within the line and scope of his or her law enforcement duties."  *Wood v. Kesler*, 323 F.3d 872, 883 (11th Cir. 2003) (citing *Ala. Code* §6-5-338 (internal quotations omitted)).  The court further explained that "[u]nder discretionary function immunity analysis, a court first determines whether the government defendant was performing a discretionary function when the alleged wrong occurred; if so, the burden shifts to the plaintiff to demonstrate that the defendant [ ] acted in bad faith, with malice or willfulness in order to deny [him] immunity."  *Wood*, supra, 323 F.3d at 883.

> Discretionary acts are "'those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances.'"

Id. at 883-84.

In the case at hand, the officers were engaged in discretionary acts when they responded to the call about a suspicious person in an otherwise abandoned area, communicated with McLaurine and placed him under arrest.  McLaurine has never established that the officers handled his questioning, arrest or booking in an inappropriate manner.  He merely disagrees that such triggered an obligation on his part to comply.  More importantly, even if McLaurine could call into

34

question some issue about how the situation was handled, it is undisputed that McLaurine refused to cooperate with the officers' request and attempted to walk away after the officers asked for identification. McLaurine has never provided a reasonable or rational reason for why he did not comply with the officers' request and more importantly, there has been no indication that the officers' request was unreasonable. McLaurine's suggestion that he should not be forced to provide identification in such a situation is misplaced.

Even if McLaurine disagrees, he cannot present evidence to dispute what the officers knew at the time and how they perceived his refusal to cooperate. To that end, the affirmation of his conviction by the Court of Criminal Appeals, renders it impossible for McLaurine to overcome the officers' immunity as to the state law claims. Any negligence claims against the officers are clearly due to be dismissed as a matter of law. See Sheth v. Webster, 145 F.3d 1231 (11th Cir. 1998). To that end, based on the totality of the circumstances, malice or willfulness are impossible to establish. The fact that McLaurine did not plead such renders any potential state law claim against the individual defendants meritless. Regardless, under the circumstances the officers made a judgment call in determining that McLaurine needed to be placed under arrest. In short, there is absolutely no evidence to support a claim of bad faith, malice or willfulness sufficient to strip the officers of their discretionary function immunity. See Green v. Byrd, 897 So.2d 1107 (Ala.Civ.App. 2003) (holding that arrests generally are classified as discretionary functions); Wright v. Wynn, 682 So.2d 1, 2 (Ala. 1996) (holding that discretionary acts are defined as situations where there are no hard and fast rule as to the course of action one must or must not take). Such is true even if in retrospect someone could argue that the matter could have been handled differently - - such a showing is not evidence or malice or bad faith. Accordingly, discretionary function immunity should be afforded to the officers and summary judgment is due to be granted to them on all or any state law claim that McLaurine attempts to bring as a matter of law. Further, because the officers should

be afforded immunity for their actions in question, the City of Auburn cannot be held liable.  See

e.g. *Gore v. City of Hoover,* 559 So.2d 163 (Ala. 1990).

The officers are also to be afforded state-agent immunity based on *Cranman*, supra, which

plainly sets out "exercising judgment in the enforcement of the criminal laws of the State, including,

but not limited to, law-enforcement officers' arresting or attempting to arrest persons . . . " as an

immune activity.[8]

McLaurine also names individual Defendants who he believes had the obligation to train and

supervise the officers and dispatchers.  Without question, those individuals would be allowed state-

agent immunity in that they would be engaged in discretionary acts if they in fact were training or

supervising as alleged[9].  See *Hardy v. Town of Hayneville,* 50 F.Supp.2d 1176, 1189 (M.D. Ala.

1999) (holding "[i]t cannot be seriously contested that decisions concerning hiring, training, and

supervision of officers fall within the discretionary authority of the Chief of Police").  Certainly the

individuals other than the Chief of Police and law enforcement officers were "formulating plans,

policies, or designs; or . . . exercising [their] judgment in the administration of a department or

agency of government, including, but not limited to, examples such as: making administrative

adjudications; allocating resources, negotiating contracts, hiring, firing, transferring, assigning or

supervising personnel . . . " *Cranman*, 792 So.2d 392, 405.  Again, there is no argument Plaintiff

can make to overcome this immunity because he does not even plead malice, willfulness or bad

faith.

---

[8]  The case of *Blackwood v. City of Hanceville*, 936 So.3d 495 (Ala. 2006) addresses the difference between statutory immunity and state-agent immunity, but based on the facts of this case, both apply and serve to immunize the defendants.

[9]  Defendants, however, assert that no one had training or supervisory responsibilities over the officers other than Chief deGraffenreid.  (deGraffenreid Aff. at ¶ 2).

Based on the facts and circumstances of this case, summary judgment is further due to be granted to the individual defendants as to the state law claims brought against them pursuant to the doctrine of absolute immunity, (see *Article I,* §14 of the *Alabama Constitution of 1901)*, and substantive immunity, (see *DeStafney v. University of Alabama,* 413 So.2d 391 (Ala. 1981)).

### 2. NO INTENTIONAL TORT AGAINST THE CITY OF AUBURN

The City of Auburn cannot be held liable for intentional torts as a matter of law.  See, e.g. *Hawkins v. City of Greenville,* 101 F.Supp.2d 1356, 1364 (M.D. Ala. 2000); *Hardy v. Town of Hayneville*, 50 F.Supp.2d 1176, 1191 (M.D. Ala. 1999).  Therefore, any claim attempting to allege intentional torts is due to be dismissed against the City of Auburn.

### 3. NEGLIGENT FAILURE TO TRAIN/SUPERVISE

The City of Auburn cannot be held liable for any wantonness count pursuant to *Hawkins*, supra, 101 F.Supp.2d at 1364 and *Hardy,* supra, 50 F.Supp.2d at 1191.

Any claim for negligent failure to train or supervise (or any general claim for negligence) against the City too must fail.  There is no evidence of an underlying wrong that would support a breach of any duty to McLaurine, assuming one existed.  In fact, again, the affirmation of McLaurine's conviction through the Alabama Court of Criminal Appeals makes it impossible to establish that any of the individuals committed any wrong towards McLaurine to support a negligent or wanton claim against the City of Auburn regarding his arrest or conviction, even if immunities were not afforded.  See *Smith v. Boyd Bros. Transportation, Inc.*, 406 F.Supp.2d 1238 (M.D. Ala. 2005)(holding that the "finding of [an] underlying tortious conduct is a precondition to invoking successfully liability for the negligent and wanton training and supervision of an employee.") (citing *Stevenson v. Precision Standard, Inc.,* 762 So.2d 820, 824 (Ala. 1999); see also *McKinnes v. American International Group, Inc.*, 420 F.Supp.2d 1254 (M.D. Ala. 2006).

37

McLaurine has presented no evidence that the City failed to train its officers, managers, directors, prosecutors or judges regarding how to handle the incident and subsequent proceedings in question. The officers committed no wrong during the course of the arrest or his conviction according to the undisputed evidence in the case. Therefore, it is impossible to maintain a cause of action for negligent failure to train or supervise. Moreover, there is no evidence that the City of Auburn was on notice that any other Defendant was likely to commit "wrongful" conduct and therefore a failure to supervise claim cannot be maintained. See Tennant v. Florida, 111 F.Supp.2d 1326, 1334 (S.D. Fla. 2000).

The Defendants further request this Court decline to exercise supplemental jurisdiction over any state law claims and dismiss said claims as a matter of law.

### E.    PUNITIVE DAMAGES

McLaurine cannot be awarded punitive damages against the City of Auburn on the state law or federal law claims. See Ala. Code § 6-11-26 (1975); City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

### IV.
### CONCLUSION

Based on the undisputed facts of this case and precedential case authority, summary judgment is due to be granted on all McLaurine's claims against all Defendants. Under the undisputed facts, there is no genuine issue of material fact to be submitted to a jury.

**Wherefore premises considered**, Defendants request this Court to grant summary judgment in its favor and dismiss all of McLaurine's claims against it as a matter of law.

Respectfully submitted this the 30th day of April 2007.


                                            /S/ Randall Morgan_____
                                            Randall Morgan [8350-R70R]
                                            Elizabeth Brannen Carter [3272-C-38-E]

HILL, HILL, CARTER, FRANCO,
  COLE & BLACK, P.C.
425 South Perry Street
Montgomery, Alabama 36101-0116
(334) 834-7600
(334) 263-5969 facsimile
Rmorgan@hillhillcarter.com
Counsel for Defendants

OF COUNSEL:

HILL, HILL, CARTER, FRANCO
  COLE & BLACK, P.C.
Post Office Box 116
Montgomery, Alabama  36101-0116
(334) 834-7600
(334) 263-5969

## CERTIFICATE OF SERVICE

I Hereby Certify that I have this date served a true and correct copy of the foregoing *Memorandum Brief in Support of Motion for Summary Judgment on Behalf of Defendants* with the Clerk of the Court for the United States District Court, for the Middle District of Alabama, using the CM/ECF system and to William S. McLaurine, II, 222 Tichenor Avenue #4, Auburn, Alabama 36830, by United States mail, postage prepaid and properly addressed on this the 30th day of April 2007.

/S/ Randall Morgan
Of Counsel